No. 96-688

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 46


EUGENE E. JACKSON and PEGGY J. JACKSON,
individually and as parents and next friends of
Aaron Jon Jackson,

Plaintiffs and Appellants,

v.

STATE OF MONTANA, a governmental entity,
THE DEPARTMENT OF FAMILY SERVICES, a state
agency, and JOHN and JANE DOES I-IV,

Defendants and Respondents.



APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert W. Holmstrom, Judge presiding.


COUNSEL OF RECORD:

For Appellants:

A. Clifford Edwards (argued) and Roger W. Frickle;
Edwards Law Firm; Billings, Montana

For Respondents:

T. Thomas Singer (argued) and Nancy Bennett; Moulton,
Bellingham, Longo & Mather, P.C.; Billings, Montana



Heard:  November 4, 1997
Submitted:  November 5, 1997
Decided:   March 10, 1998
Filed:


_____
Clerk

Justice Jim Regnier delivered the opinion of the Court.


¶1   In April 1994, adoptive parents Eugene and Peggy Jackson filed an action based in negligence with the District Court for the Thirteenth Judicial District in Yellowstone County against the State of Montana, the Department of Family Services, and John and Jane Does

I-IV (the State).  The Jacksons primarily alleged the State negligently misrepresented, and failed to disclose to them, certain material facts regarding the psychological and medical background of their adoptive son's birth mother and putative father.

¶2   On August 7, 1995, the State filed an initial motion for summary judgment with respect to all counts contained in the Jacksons' complaint.  The Jacksons amended their complaint in November 1995, and the State filed a supplemental motion for summary judgment in April 1996.  On November 6, 1996, the District Court issued an order granting the State's original and supplemental motions for summary judgment.  It is from this order that the Jacksons presently appeal.  For the reasons discussed below, we reverse.

¶3   We find the following issues dispositive on appeal:

¶4   1.   Did the District Court err in concluding the State had neither a common law nor a statutory duty to fully and accurately disclose to the Jacksons information in its possession regarding the psychological and medical background of their adoptive son's birth mother and putative father?

¶5   2.   Did the District Court err in implicitly concluding the State sufficiently established the absence of any genuine issue of material fact regarding a causal connection between the State's allegedly negligent conduct and the Jacksons' injuries?

FACTUAL AND PROCEDURAL BACKGROUND

¶6   Lawrence John Allen Russell (later renamed Aaron Jon Jackson by his adoptive parents and hereinafter referred to as Aaron) was born on November 8, 1983, to Deborah Annette Russell, his biological mother.  Aaron's two putative fathers are Brian Scott and Robert T. Stevens.  Russell spent much of her pregnancy incarcerated at the Women's Correctional Center at Warm Springs, Montana, during which period she underwent a psychological evaluation by clinical psychologist, Dr. B. A. Peters.  Dr. Peters concluded that Russell had a Full Scale I.Q. of 73, and wrote that certain test scores "strongly suggest []"
the presence of an "organic or psychiatric impairment."  Dr. Peters additionally described Russell's thinking as "disorganized, unconventional, diffused, [and] possibly at times delusional" and characterized her as an "emotionally immature and inappropriate" young woman who "is making a marginal psychological adjustment."  Ultimately, Dr. Peters diagnosed Russell with borderline intellectual functioning and inadequate personality.

¶7   In January 1984, Russell fed her infant son soda pop, meat, and vegetables, which caused him to aspirate and led to his hospitalization.  As a result of this incident, the State began providing child protective services to Russell and Aaron.  In February 1984, social worker Marylis Filipovich prepared a social study in which she noted Russell's "IQ is approximately 70, and [she] functions as though she is retarded."  In conclusion, Filipovich remarked that "[b]esides [Russell's] low functioning, she seems to be quite disturbed and will need professional counseling."

¶8   In the following months, the State continued to provide child protective services to Aaron, Russell, and Aaron's two putative fathers, Brian Scott and Robert Stevens.  The State, in fact, entered into a service treatment agreement with Russell and Scott, and into a second such agreement with Russell and Stevens.  Moreover, the State arranged for Russell to undergo a psychological evaluation by clinical psychologist Kenneth Collier, on June 7, 1984.  In his report, Dr. Collier noted that "[p]eople who produce similar clinical profiles are seen as having a long-standing and chronic emotional disturbance, most likely a personality

disorder, though a paranoid disorder should be considered."  Dr. Collier described Russell
as "clinically intellectually dull" and his ultimate diagnosis was one of "Paranoid Personality
Disorder with mild mental retardation."

¶9   In December 1983, Aaron's putative father, Stevens, was treated on an inpatient basis
by Dr. R. V. Edwards of the Veterans Administration Medical Center in Sheridan, Wyoming.
In his written report, Dr. Edwards noted that Stevens complained of "feelings of unreality
as though things were floating" and diagnosed him with a "schizophrenic disorder, paranoid
type."  The State acquired a copy of Dr. Edwards' evaluation prior to Aaron's adoption in
1986.

¶10  On August 1, 1984, social worker Dave Wallace submitted a report to the court on
behalf of the State which chronicled Russell's difficulties and recommended that the State
receive permanent custody of Aaron and that he be made available for adoption.  Among the
items referenced in the report, were Dr. Peters' and Dr. Collier's psychological evaluations,
as well as Filipovich's social study.  In addition, copies of Dr. Peters' and Dr. Collier's
reports
were attached to the report.

¶11   On December 31, 1984, the District Court issued an order terminating the parental
rights of Russell, Scott, and Stevens, and awarded permanent legal custody of Aaron to the
State with the right to consent to his adoption.  Roughly one month later, resource worker
Betty Petek contacted the Jacksons and informed them that Aaron was available for adoption.

¶12  The Jacksons had applied with the State to become adoptive parents just one week
after Aaron's birth, in November 1983.  To become adoptive parents, the Jacksons completed
a written application and participated in personal interviews with Petek.  During the course
of this application process, the Jacksons advised Petek that they could not provide care for
a child that had, or might be at risk for, developing a mental disorder.  On March 10, 1984,
Petek completed the Jacksons' adoptive home study and recommended that they "be
approved for the adoption of one Caucasian child, either sex, infancy through two years of
age," noting that they would consider adopting a child with "a minor correctable handicap."
In accordance with Petek's recommendation, the Jacksons were approved as adoptive parents
on May 1, 1984.

¶13   Thus, in January 1985, shortly after Aaron became available for adoption, Petek
contacted the Jacksons and informed them of Aaron's availability.  That evening, the
Jacksons discussed the possibility of adopting fifteen-month-old Aaron and agreed between
the two of them that "if the family history was acceptable . . . and if the child appeared
normal looking physically, that [they] would probably take him."  On January 28, 1985, the
Jacksons met with Petek and Wallace to discuss Aaron's family background, and the
possibility of initiating visits with Aaron.

¶14   During this visit, the Jacksons specifically asked Wallace and Petek whether there was
any history of mental illness in Aaron's family.  Although they were each aware of the
reports completed by Dr. Peters, Dr. Collier, and Dr. Edwards, as well as Filipovich's social
study, neither Wallace nor Petek disclosed the content of these evaluations to the Jacksons
in response to their inquiry.  In Wallace's actual possession at the time of this meeting were
Filipovich's social study, a January 9, 1985,  social history update, and his August 1, 1984,
report to the court to which copies of Dr. Peters' and Dr. Collier's evaluations had been
attached.  Wallace generally referred to the documents in his possession to answer the
Jacksons' questions during the visit, but did not provide them with copies and did not
disclose the various psychological evaluations.

¶15   Instead, Peggy Jackson's deposition testimony indicates that Wallace and Petek provided the Jacksons with the following background information during this January 28, 1985, meeting:

> They told us that Aaron was removed from his parents, that they determined the mother not capable of caring for him, that when he was very little, that she had attempted to feed him some sort of solid food and pop and he aspirated and was hospitalized. . . .

> We talked about family.  They mentioned that she came from a family, how they termed it was, several generation welfare family, it was low economic status.  They felt the family was socially inept.  They mentioned, well, when we asked what the mother was like, they told us that physically she was healthy.

> There may have been a possibility of some drug usage, but they felt that was minimal, because they told us she had been incarcerated for most of her pregnancy on a criminal charge.

> We asked why she was unable to take care of Aaron, and we were told that she moved around a lot and that she didn't meet his needs for feeding him or caring for him physically and that she didn't appear to even have the interest to stick it out and stay with him and learn those skills.

¶16   In the weeks following their meeting with Wallace and Petek, the Jacksons visited with Aaron on a number of occasions, and entered into an adoptive placement agreement with the State on March 5, 1985.  On January 2, 1986, the District Court issued an order finalizing Aaron's adoption.

¶17   Although the State's records included Dr. Peters' and Dr. Collier's psychological evaluations of Russell, Filipovich's social study, and Dr. Edwards' report concerning Aaron's putative father, Stevens, the State never disclosed the content of these evaluations to the Jacksons prior to the finalization of Aaron's adoption in January 1986.

¶18   Aaron began to exhibit behavioral problems, and on December 16, 1987, the Jacksons took Aaron to the Child Study Center at the Children's Clinic in Billings, Montana, where Dr. Paul R. Crellin performed a pediatric and pediatric neurological evaluation.  Aaron's behavior had become such that he "could not seem to keep attention, was disruptive, frustrated, [and] was always going fast and 'furious,' and this was becoming more and more of a problem" for those around him.  Dr. Crellin concluded that "Aaron had significant attention deficit disorder with hyperactivity" and noted that it was "impossible to tell whether or not this is a genetic trait that he inherited from his mother or father, or whether it has to do with the chemical or substance abuse that the mother had during her pregnancy."

¶19   The record in this case documents Aaron's continuing history of psychological and emotional problems.  On February 7, 1989, for example, clinical psychologist Dr. Ned N. Tranel evaluated Aaron and concluded that he "displays a host of features of attention deficit disorder with and without hyperactivity."  Clinical psychologist Dr. William Dee Woolston first saw Aaron in October 1991, and continues to treat him.  In a December 1994 report, Dr. Woolston explained that he had diagnosed Aaron with pervasive developmental disorder, learning disorder, and attention deficit hyperactivity disorder.  In November 1991, Aaron was hospitalized at the Deaconess Psychiatric Center Youth Treatment Unit where he began a course of psychopharmaceutical treatment.   On the date of Aaron's discharge, Dr. J. Earle diagnosed Aaron with psychotic disorder, history of attention deficit hyperactivity disorder,

and pervasive developmental disorder.

¶20   Aaron was readmitted into the deaconess Medical Center on two separate occasions in December 1992, and has since seen Dr. Woolston for ongoing psychotherapy.  Aaron has additionally been under the continuous care of Dr. John Talbot Blodgett, a child and adolescent psychiatrist.

¶21   On April 6, 1994, the Jacksons filed a negligence action in District Court against the named defendants in this case.  In their original complaint, the Jacksons asserted claims against the State for breach of contract, negligent misrepresentation, negligent disclosure, and negligent supervision.  On August 7, 1995, the State filed a motion for summary judgment with respect to each count leveled against it in the Jacksons' complaint.  The Jacksons subsequently abandoned their claim for breach of contract, and on September 22, 1995, the parties attended a final pretrial conference.  As a result of the pretrial conference, the District
Court vacated the trial date and issued a new scheduling order.

¶22   The Jacksons obtained permission from the District Court to amend their complaint, and on November 6, 1995, filed an amended complaint which omitted their original breach of contract claim and added an additional cause of action for negligence based upon the doctrine of informed consent.  The amended complaint additionally contained a revised caption pursuant to which the Jacksons sought to bring suit, not only in their individual capacities, but also "as parents and next friends of Aaron Jon Jackson."

¶23   In response to the amended complaint, the State renewed its original motion for summary judgment and filed a supplemental motion for summary judgment on April 19, 1996.  On November 6, 1996, the District Court issued an order granting the State's original and supplemental motions for summary judgment.  It is from this order that the Jacksons presently appeal.  For the reasons stated below, we reverse the order of the District Court.

                    STANDARD OF REVIEW

¶24   This Court's standard of review in appeals from summary judgment rulings is de novo. Treichel v. State Farm Mut. Auto. Ins. Co. (1997), 280 Mont. 443, 446, 930 P.2d 661, 663. (citing Motarie v. Northern Montana Joint Refuse Disposal Dist. (1995), 274 Mont. 239, 242, 907 P.2d 154, 156; Mead v. M.S.B., Inc.  (1994), 264 Mont. 465, 470, 872 P.2d 782, 785).  This Court reviews a summary judgment order entered pursuant to Rule 56, M.R.Civ.P., based on the same criteria applied by the district court.  Treichel, 280 Mont. at 446, 930 P.2d at 663 (citing Bruner v. Yellowstone County (1995), 272 Mont. 261, 264, 900 P.2d 901, 903).

¶25   In proving that summary judgment is appropriate:
    The movant must demonstrate that no genuine issues of material fact exist.
    Once this has been accomplished, the burden then shifts to the non-moving
    party to prove by more than mere denial and speculation that a genuine issue
    does exist.  Having determined that genuine issues of material fact do not
    exist, the court must then determine whether the moving party is entitled to
    judgment as a matter of law.  [This Court] reviews the legal determinations
    made by the district court as to whether the court erred.

Bruner, 272 Mont. at 264-65, 900 P.2d at 903.

¶26   Moreover, the "moving party has the burden of showing a complete absence of any

genuine issue as to all facts considered material in light of the substantive principles that entitle the moving party to judgment as a matter of law and all reasonable inferences are to be drawn in favor of the party opposing summary judgment."  Kolar v. Bergo (1996), 280 Mont. 262, 266, 929 P.2d 867, 869.

## DISCUSSION

¶27  The crux of the Jacksons' "wrongful adoption" suit is their allegation that the State negligently misrepresented, and failed to disclose to them, certain material facts regarding the psychological background of their adoptive son's birth mother and putative father.  To determine whether Montana law recognizes a cause of action for "wrongful adoption," such as the one initiated in the present case, we must simply determine "whether long-standing common law causes of action should be applied to the adoption context."  Gibbs v. Ernst (Pa. 1994), 647 A.2d 882, 886.  Indeed, a number of courts have recognized "that the question of whether to recognize causes of action for 'wrongful adoption' simply requires the straightforward application and extension of well-recognized common-law actions, such as negligence and fraud, to the adoption context and not the creation of new torts."  Mallette v. Children's Friend and Service (R.I. 1995), 661 A.2d 67, 69 (citing Roe v. Catholic Charities of the Diocese of Springfield (1992), 588 N.E.2d 354, 357, appeal denied, 602 N.E.2d 475 (1992)); see also Gibbs, 647 A.2d at 886.

¶28  Here, the Jacksons have brought a negligence-based action against the State, specifically alleging claims for negligent misrepresentation, negligent nondisclosure, negligence based on a lack of informed consent, and negligent supervision.  The present appeal thus requires us to determine whether these "long-standing common law causes of action should be applied to the adoption context" and whether they constitute viable claims in the present case.  Gibbs, 647 A.2d at 886.

## ISSUE 1

¶29  Did the District Court err in concluding the State had neither a common law nor a statutory duty to fully and accurately disclose to the Jacksons information in its possession regarding the psychological and medical background of their adoptive son's birth mother and putative father?

¶30  As noted, the Jacksons have asserted four negligence-based claims against the State, including claims for negligent misrepresentation, negligent nondisclosure, negligence based on lack of informed consent, and negligent supervision.  It is well-established that a plaintiff in a negligence action must prove the existence of a duty, breach of duty, causation, and damages.  See e.g., Kitchen Krafters v. Eastside Bank of Montana (1990), 242 Mont. 155, 161, 789 P.2d 567, 571, overruled in part on other grounds by Busta v. Columbus Hosp. Corp. (1996), 276 Mont. 342, 370, 916 P.2d 122, 139.  Thus, the presence of a legal duty is an essential element of each of the Jacksons' negligence-based claims at issue on appeal.

¶31  We have recognized that "the existence of a legal duty is a question of law to be determined by the district court."  Yager v. Deane (1993), 258 Mont. 453, 456, 853 P.2d 1214, 1216.  We review such a conclusion of law by the district court to determine whether the court's interpretation of the law is correct.  Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 687.

¶32  On appeal, the Jacksons urge the District Court erred in concluding the State owed them no duty of care upon which they may now premise their claims for negligence and negligent misrepresentation. The Jacksons first argue the court erred in concluding the State had no common law duty to fully and accurately disclose certain background information regarding the psychological health of Aaron's birth parents. The Jacksons next contend the

court similarly erred in concluding the State had no statutory duty to disclose the background information which the Jacksons allege was withheld in this case.

¶33  In contrast, the State argues it had neither a common law nor a statutory duty to disclose in the present case.  More specifically, the State argues it had no common law duty because it made no misleading statements to the Jacksons regarding Aaron's familial background.  The State next contends the imposition of a either a common law or statutory duty to disclose the background information allegedly withheld in the present case would conflict with the State's statutory duty to maintain confidentiality of the birth parents' medical records.

¶34  Thus, with respect to our discussion in the present case, we must first determine whether the lower court erred in concluding the State owed no common law or statutory duty to the Jacksons to either disclose or avoid negligently misrepresenting certain information in its possession regarding the psychological background of their adoptive son's birth mother and putative father.

A.   Common law duty: negligent misrepresentation

¶35  We turn initially to the question of whether th e State had a common law duty sufficient to support the Jacksons' negligence-based claims in the present case.  Of central importance to the Jacksons' suit is their claim for negligent  misrepresentation, in which they allege the State misrepresented certain material facts regarding Aaron's family background.

¶36  This Court has long recognized the common law tort of negligent misrepresentation.  See, e.g., Kitchen Krafters, 242 Mont. at 165, 789 P.2d at 573.  In Kitchen Krafters, we set out the following elements of a claim for negligent misrepresentation:

     a)   the defendant made a representation as to a past or existing material fact;

     b)   the representation must have been untrue;

     c)   regardless of its actual belief, the defendant must have made the representation without any reasonable ground for believing it to be true;

     d)   the representation must have been made with the intent to induce the plaintiff to rely on it;

     e)   the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation;

     f)   the plaintiff, as a result of its reliance, must sustain damage.

Kitchen Krafters, 242 Mont. at 165, 789 P.2d at 573.

¶37  To succeed with a claim for negligent misrepresentation, a party need not demonstrate an intent on the part of a defendant to misrepresent, but must merely show "a failure to use reasonable care or competence in obtaining or communicating . . . information."  Barrett v. Holland & Hart (1992), 256 Mont. 101, 107, 845 P.2d 714, 717.  See also Batten v. Watts Cycle and Marine, Inc. (1989), 240 Mont. 113, 117, 783 P.2d 378, 381, cert. denied, 494 U.S. 1087 (1990). For liability to arise, "it [is] not necessary that the negligent

misrepresentation constitute constructive fraud, nor actual fraud." Bottrell v. American Bank (1989), 237 Mont. 1, 21, 773 P.2d 694, 706. Rather, a "want of ordinary care" on the part of a defendant may, under certain circumstances, give rise to liability for negligent misrepresentation. Bottrell, 237 Mont. at 21, 773 P.2d at 706. The presence of a duty to exercise due care is thus a requisite element of any claim for negligent misrepresentation.

¶38  We have previously held that "[t]he existence of a duty of care [in a negligence-based action] depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against the imposition of liability." Singleton v. L.P. Anderson Supply Co., Inc. (Mont. 1997), 943 P.2d 968, 971, 54 St. Rep. 738, 739 (quoting Maguire v. Department of Institutions (1992), 254 Mont. 178, 189, 835 P.2d 755, 762).
1.   Public Policy

¶39  Among those policy considerations this Court will weigh in determining whether to impose a duty are

> (1) the moral blame attached to a defendant's conduct; (2) the prevention of future harm; (3) the extent of the burden placed on the defendant; (4) the consequences to the public of imposing such a duty; and (5) the availability and cost of insurance for the risk involved.

> Singleton, 943 P.2d at 971, 54 St. Rep. at 739 (citing Phillips v. City of Billings (1988), 233

Mont. 249, 253, 758 P.2d 772, 775). See also, Estate of Strever v. Cline (1996), 278 Mont. 165, 172, 924 P.2d 666, 670.

¶40  As the question of whether public policy weighs in favor of the imposition of a duty upon the State to use due care in disclosing information regarding an adoptive child's birth parents is one of first impression in Montana, we turn for initial guidance to case law from other jurisdictions. Courts in a number of other states have, under certain circumstances, recognized a cause of action for negligent misrepresentation in the adoption context and the concomitant presence of a duty on the part of an adoption agency to use due care in disseminating medical background information to potential adoptive parents. See, e.g., Mohr v. Commonwealth (Mass. 1995), 653 N.E.2d 1104; M.H. and J.L.H. v. Caritas Family Services (Minn. 1992), 488 N.W.2d 282, 288; Gibbs v. Ernst (Pa. 1994), 647 A.2d 882, 891-92; Mallette v. Children's Friend and Service (R.I. 1995), 661 A.2d 67, 71; Meracle v. Children's Service Society of Wisconsin (Wisc. 1989), 437 N.W.2d 532, 537. But see Michael J. v. Los Angeles County, Department of Adoptions (1988), 201 Cal. App. 3d 859, 874-75; Richard v. Vista Del Mar Child Care Service (1980), 106 Cal. App. 3d 860, 866-68.

¶41  In recognizing that an adoption agency may owe such a duty to use reasonable care, these courts have invariably premised that duty "on the adoption agencies' voluntary dissemination of health information concerning the child to potential adopting parents." Mallette, 661 A.2d at 70. Courts have commonly recognized that a duty on the part of the adoption agency to use due care may arise only when the agency "begin[s] volunteering information to potential adopting parents." Mallette, 661 A.2d at 70. See also Caritas, 488 N.W.2d at 288 (concluding that adoption agencies must "use due care to ensure that when they undertake to disclose information about a child's genetic parents and medical history, they disclose that information fully and adequately . . ."); Meracle, 437 N.W.2d at 537 (where an adoption agency makes affirmative misrepresentations about a child's health and background, it has assumed a duty); Gibbs, 647 A.2d at 890 (recognizing that "an adoption agency has assumed the duty to tell the truth when it volunteers information to prospective parents"). Thus, courts will, under certain circumstances, impose upon adoption agencies a duty to use due care and to refrain from making negligent misrepresentations where the agencies undertake to volunteer information to potential adoptive parents.

¶42   Prior to reaching such a conclusion, virtually every court with occasion to address the question of whether an adoption agency may, under certain circumstances, owe a common law duty to prospective parents has discussed conflicting issues of public policy.  See, e.g., Gibbs, 647 A.2d at 891; Meracle, 437 N.W.2d at 537; Caritas, 488 N.W.2d at 287-88; Mallette, 661 A.2d at 71-72; Mohr, 653 N.E.2d at 1111-12; Roe, 588 N.E.2d at 365.

¶43   In the case of Gibbs, for example, the Supreme Court of Pennsylvania recognized competing interests between prospective parents and adoption agencies, but ultimately sided with "a policy in favor of full and accurate disclosure of a child's medical history" because such disclosure "ensures that the adopting parents are emotionally and financially equipped to raise a child with special needs."  Gibbs, 647 A.2d at 887.  Moreover, the court recognized that "[f]ailure to provide adequate background information can result in the placement of children with families unable or unwilling to cope with physical or mental problems, leading to failed adoptions."  Gibbs, 647 A.2d at 887.

¶44   In Gibbs, a couple specifically informed an adoption agency that they wished to adopt a child with "no history of sexual or physical abuse or any mental or emotional problems." Gibbs, 647 A.2d at 884.   The agency then informed the couple that a five-year-old boy, who was hyperactive and had suffered from neglect, was available for adoption.  Gibbs, 647 A.2d at 884-85.  The adoption agency provided the adoptive parents with additional background information regarding the child, but, despite repeated requests by the parents for information regarding the child's psychological and emotional history, failed to disclose to them the child's extensive history of sexual and physical abuse, as well as his history of violent behavior.  Gibbs, 647 A.2d at 885.  Immediately after the adoption was finalized, the child "began experiencing severe emotional problems" and displaying extremely violent behavior. Gibbs, 647 A.2d at 885.

¶45   The adoptive parents subsequently brought suit against the adoption agency, alleging counts for wrongful adoption and negligent placement. Gibbs, 647 A.2d at 886. The Pennsylvania Supreme Court held that "traditional common law causes of action grounded in fraud and negligence do apply to the adoption setting," and concluded that the adoptive parents could proceed on  the common law claims of fraud, negligent misrepresentation, and negligent failure to disclose suggested by the complaint.  Gibbs, 647 A.2d at 887.  With respect to the adoptive parents' claim for negligent misrepresentation, the court specifically concluded that "the adoption agency has assumed a duty to tell the truth when it volunteers information to prospective parents, but has failed to perform that duty."  Gibbs, 647 A.2d at 890. The court noted that recognizing the tort of negligent misrepresentation in the adoption context would place a heightened burden upon adoption agencies, but concluded that public policy considerations justified the imposition of such a burden. Gibbs, 647 A.2d at 891.  The court noted the burden was tempered by the fact that "adoption agencies need not offer warranties or guarantees as to the information they supply." Gibbs, 647 A.2d at 891.

¶46   The Supreme Court of Rhode Island has similarly recognized that when adoption agencies "begin volunteering information to potential adopting parents" they assume a duty to use due care in refraining from making negligent misrepresentations.   Mallette, 661 A.2d at 70-71. In Mallette, adoptive parents alleged the adoption agency negligently misrepresented and failed to disclose information it had regarding their adopted child's family and medical history.  Mallette, 661 A.2d at 68.  More specifically, the parents alleged the adoption agency informed them that the child's "mother suffered from learning disabilities caused solely by head trauma as a young child" but failed to disclose to them that the birth mother "had been diagnosed as mildly to moderately retarded with only a 'possibility' that such retardation resulted from head trauma."  Mallette, 661 A.2d at 68.  The parents additionally alleged the agency knew, but failed to disclose, that the biological mother "had been diagnosed as possessing macrocephaly, pseudoepicanthal folds, a high-arched palate,

tachycardia, small clinodactyly of the fifth fingers, tremors of the hands, and poor coordination." Mallette, 661 A.2d at 68.

¶47 The court concluded that when the agency "began allegedly volunteering information concerning [the child's] and his biological mother's medical and genetic background the agency assumed a duty to refrain from making negligent misrepresentations." Mallette, 661 A.2d at 71. In so concluding, the court reasoned that permitting the adoptive parents to maintain a claim for negligent misrepresentation against the adoption agency would in fact "promote public policy" and "would not create any substantial additional burdens on adoption agencies." Mallette, 661 A.2d at 71-72. The court reasoned that "in order to avoid liability, an adoption agency needs simply to refrain from making representations, or if it does begin making representations, it must do so in a nonnegligent manner." Mallette, 661 A.2d at 73.

¶48 Turning back to the case at hand, we conclude, as has the recent majority of courts addressing this issue, that recognizing a cause of action for negligent misrepresentation in the adoption context will, in fact, promote public policy and ensure that "adoptive parents assume the awesome responsibility of raising a child with their eyes wide open." Roe, 588 N.E.2d at 365.

¶49 As have those courts holding adoption agencies assume a duty to refrain from making negligent misrepresentations when they begin volunteering information to potential adoptive parents, this Court has similarly recognized the fundamental principle that,

> where a person undertakes to do an act or discharge a duty by which the conduct of another may be properly regulated and governed, he is bound to perform it in such a manner that those who are rightfully led to a course of conduct or action on the faith that the act or duty will be duly and properly performed shall not suffer loss or injury by reason of negligent failure so to perform it.

Stewart v. Standard Publishing Co. (1936), 102 Mont. 43, 50, 55 P.2d 694, 696 (quoting 45 C.J. 650). See also, Sult v. Scandrett (1947), 119 Mont. 570, 573, 178 P.2d 405, 406-07; Yager v. Deane (1993), 258 Mont. 453, 457, 853 P.2d 1214, 1217 (quoting Stewart and recognizing principle, but finding no duty under the circumstances of that case).

¶50 In the instant case, the Jacksons argue the State, in fact, disclosed certain background information regarding Aaron's birth parents, and in doing so, assumed a duty to use due care and to completely and accurately disclose that information. The State, however, argues it made no misleading statements to the Jacksons regarding the psychological background of Aaron's birth mother and putative father, and, therefore, that it assumed no such duty. The State asserts that, although it did provide the Jacksons with a great deal of information about Aaron's background prior to the adoption, it did not provide them with any inaccurate or misleading information regarding the psychological background of his birth parents. Specifically, the State argues its employees knew of no familial predisposition for mental illness, made no attempts to conceal information from the Jacksons, and did not assure them that Aaron would be free from mental illness.

¶51 As the State concedes, review of the record indicates that Wallace and Petek did indeed provide the Jacksons with certain information regarding Aaron's background. For example, deposition testimony from the Jacksons indicates that Wallace and Petek informed them of the possibility that Aaron's birth mother had used drugs or alcohol early in her pregnancy, that Aaron had been removed from the custody of his birth mother due to her inability to care for him, and that his birth mother had caused him to aspirate on solid food and soda pop when he was a young infant. The Jacksons' deposition testimony further

indicates that Wallace and Petek revealed that Aaron's birth mother came from a multi-generation welfare family and that the family was socially inept, but that Aaron's birth mother was physically healthy.  We conclude that the State, when it began volunteering such background information to the Jacksons, assumed a duty to do so with due care.  Whether the State breached that duty and negligently misrepresented information to the Jacksons is a question of material fact precluding summary judgment in the State's favor.

¶52  With respect to the first of several specific public policy factors implicated in this case, we conclude that to require anything less from the State than the exercise of due care in the dissemination of information in its possession to prospective adoptive parents would be simply unacceptable.  We recognize that the imposition of such a duty indeed places a slight burden on the State, but conclude that burden is justified in light of the compelling need for adoptive parents to receive all available information regarding a child who may soon become a permanent part of their family.  We conclude that "[f]ull disclosure of a child's medical and familial background" is warranted "not only to enable adoptive parents to obtain timely and appropriate medical care for the child, but also to enable them to make an intelligent and informed decision to adopt." Mohr, 653 N.E.2d at 1112.   Furthermore, we note the imposition of such a duty will increase public trust in our State agencies, and "will give potential parents more confidence in the adoption process and in the accuracy of the information they receive."  Meracle, 437 N.W.2d at 537.  Finally, for the reasons discussed later in this opinion, we reject the State's argument that the imposition of a common law duty would conflict with its duty to maintain confidentiality of the birth parents' medical records in this case.  In light of the fact that the State undertook to disclose to the Jacksons certain information regarding Aaron's birth parents, we conclude that public policy considerations justify the imposition of a duty upon the State in the present case.

2.   Foreseeability

¶53  Of additional and equally vital importance to our inquiry into the presence of a common law duty in the instant case is the question of foreseeability.  As noted above, we have held that the existence of a duty of care in a negligence-based action depends, not only "upon a weighing of policy considerations for and against the imposition of liability," but also "upon the foreseeability of the risk" involved.   Singleton v. L.P. Anderson Supply Co., Inc. (1997), 943 P.2d 968, 971, 54 St. Rep. 738, 739 (quoting Maguire v. Department of Institutions (1992), 254 Mont. 178, 189, 835 P.2d 755, 762).

¶54  In Busta v. Columbus Hospital Corp. (1996), 276 Mont. 342, 370, 916 P.2d 122, 139, we clarified "that foreseeability is an element of negligence, and therefore, properly considered with the existence of duty."  In evaluating the presence of a duty of care, this court measures foreseeability "on a scale of reasonableness" pursuant to which the appropriate inquiry is into "what the reasonably prudent person would then have foreseen as likely to happen."  Schafer v. State, Dept. of Institutions (1979), 181 Mont. 102, 106, 592 P.2d 493, 495, overruled in part on other grounds by Estate of Strever v. Cline (1996), 278 Mont. 165, 178, 924 P.2d 666, 674 (quoting Mang v. Eliasson (1969), 153 Mont. 431, 436-37, 458 P.2d 777, 781). In Mang, we recognized that foreseeability thus "constitutes a limitation on the otherwise potentially infinite liability which would follow every alleged negligent act," and concluded that "[f]oreseeability is of prime importance in establishing the element of duty."  Simply put, if a reasonably prudent person can foresee no risk of injury, that person is not negligent.  Mang, 153 Mont. at 437, 458 P.2d at 781.

¶55  In the present case, the District Court concluded that the Jacksons failed to demonstrate the requisite element of foreseeability, and thus concluded the Jacksons "failed to sustain their burden of establishing . . . the existence of a duty on the part of the" State.
More specifically, the court concluded that the Jacksons had failed to adequately demonstrate that the State knew, or should have known, that withholding background

medical information regarding Aaron's birth parents would result in a risk of injury to the Jacksons. In so concluding, the court noted that the Jacksons' expert, Dr. Blodgett, "has testified that he did not know what caused Aaron's condition" and that the Jacksons therefore failed to establish that the State knew or should have known that the psychological information allegedly withheld would result in a risk of injury to the Jacksons.

¶56 Other courts faced with the question of whether an adoption agency has a common law duty to accurately communicate information to prospective parents have similarly recognized that foreseeability is a critical element of duty, and that "the liability of adoption agencies is limited to those conditions reasonably predictable at the time of placement. Gibbs, 647 A.2d at 891 (citing Vista Del Mar, 106 Cal. App. 3d at 867; Roe, 588 N.E.2d at 361; Foster v. Bass (Miss. 1990), 575 So. 2d 967, 975). In Gibbs, the Pennsylvania Supreme Court held that, "under the traditional principles of negligence, the duty of adoption agencies for the purposes of negligent misrepresentation will only apply where the condition of the child was foreseeable at the time of placement so that the agency is blameworthy in making a misrepresentation." Gibbs, 647 A.2d at 892. Moreover, a number of courts have recognized that, in determining whether there exists a duty on the part of an adoption agency under any given set of factual circumstances, "'the common law notion of foreseeability as found in the concepts of duty and proximate cause' prevents the tort of negligent 'wrongful adoption' from making adoption agencies guarantors of children's future health." See, e.g., Mohr, 653 N.E.2d at 1113 (quoting Gibbs, 647 A.3d at 891).

¶57 With respect to the Jacksons' claim for negligent misrepresentation in the present case, we are of the similar opinion that the State owes the Jacksons a duty of due care only if it was reasonably foreseeable that Aaron was at a greater risk for the development of health problems due to his parents' mental health. As did the District Court, we turn to Dr. Blodgett's deposition testimony to determine whether the Jacksons have sustained their burden of demonstrating that, at the time of Aaron's adoption in 1985, the State could reasonably have foreseen that Aaron was at risk for developing the emotional and psychological problems he presently displays. In concluding that the Jacksons failed to properly demonstrate foreseeability, the court noted that, by his own admission, Dr. Blodgett did not know what caused Aaron's condition. Indeed, in response to questioning by the State's attorney, Dr. Blodgett concedes as follows: "Do I know what's caused Aaron's illness? No I do not."

¶58 To establish a duty on the part of the State, however, the Jacksons need not prove with absolute scientific and medical certainty the presence of a genetic link between Aaron's psychological and emotional problems and those suffered by his birth mother and putative father. Rather, as stated above, the Jacksons need only demonstrate reasonable foreseeability. In other words, the Jacksons need only demonstrate that the State could reasonably have foreseen that Aaron was at risk for later manifesting an array of psychological and emotional problems, not that the psychological impairments suffered by Aaron's birth mother and putative father have definitively caused Aaron's present difficulties.

¶59 With this standard in mind, we hold the District Court erred in concluding that because Dr. Blodgett concedes he does not know what has caused Aaron's illness the Jacksons have failed to demonstrate reasonable foreseeability. Rather, a review of Dr. Blodgett's entire deposition testimony leads us to the opposite conclusion. For example, referring to those psychological evaluations of Aaron's birth mother and putative father allegedly withheld in this case, Dr. Blodgett emphasizes the following:

> [Y]ou know, the principal point that I'd like to make in this is that I do believe that -- given the diagnoses of the mother and the putative father, Stevens -- particularly the putative father, Stevens -- that even by 1980, '82, '83 standards, that there was enough known of familial patterns that we understood that there

were significant biological risks to people -- or significant risks to people who were first-degree relatives to people with those diagnoses.

¶60   In his ensuing testimony, Dr. Blodgett engages in an at-length discussion of the "familial patterns" to such disorders as schizophrenia.  Having reviewed all of Dr. Blodgett's deposition testimony, we hold the District Court erred in concluding the Jacksons failed to establish the requisite element of foreseeability in this case.  Review of Dr. Blodgett's deposition indicates the Jacksons have sufficiently demonstrated that, in light of the information the State had regarding the psychological and emotional health of Aaron's birth mother and putative father, the State could reasonably have foreseen that Aaron would later manifest an array of psychological and emotional problems.

¶61   Based on the foregoing discussion, we hold that when the State began volunteering information regarding the health of Aaron's biological family, it assumed a duty to do so with due care and to refrain from negligently misrepresenting that information to the Jacksons.  Whether the State in fact breached that duty presents a genuine issue of material fact precluding summary judgment in the State's favor with respect to the Jacksons' claim for negligent misrepresentation.

B.   Statutory duty: negligent nondisclosure and negligence

¶62   In addition to a claim for negligent misrepresentation, the Jacksons' complaint sets forth claims against the State for negligent nondisclosure and negligence based upon a lack of informed consent.  As with the Jacksons' claim for negligent misrepresentation, the presence of a legal duty is an integral element of their remaining claims for negligent nondisclosure and negligence.  See Kitchen Krafters, 242 Mont. at 162, 789 P.2d at 571. (recognizing presence of a duty is an essential element of any negligence action).  It is axiomatic that applicable statutes may create a duty in a negligence action.  See, e.g., Rookhuizen v. Blain's Mobile Home Court, Inc. (1989), 236 Mont. 7, 10, 767 P.2d 1331, 1333 (recognizing duty in negligence action may be established by statute or common law). We thus turn to Montana's statutory framework to determine whether the State had an independent duty of disclosure sufficient to support the Jacksons' claims for negligence based upon the alleged withholding of information by the State.

¶63   In its order granting the State's motion for summary judgment, the District Court concluded that the State had no statutory duty "to disclose the information which the [Jacksons] claim was withheld in this case" and accordingly rejected the Jacksons' "claim that the [State was] negligent in violating a statutorily imposed duty."

¶64   On appeal, the Jacksons argue that the Uniform Adoption Act of Montana, in fact, imposed upon the State a duty to disclose all available non-identifying information regarding Aaron's familial background, sufficient to support their negligence-based claims, and that the District Court erred in concluding otherwise.  In contrast, the State argues it had no statutory duty to disclose to the Jacksons any more medical or psychological information regarding Aaron's birth family than it actually did.  More specifically, the State concedes that it had a limited duty of disclosure pursuant to § 40-8-122(1)(c), MCA, but argues it fulfilled that duty by disclosing a variety of background information to the Jacksons.  The State next argues it was, in fact, statutorily precluded from releasing the psychological reports at issue in this case.

¶65   As noted, the State preliminarily acknowledges that § 40-8-122(1)(c), MCA, required that it file a report with the court stating that, among other things, "medical and social histories [had] been provided to the adoptive parent."  The State contends that it complied with this requirement, and that it had no duty, statutory or otherwise, to provide the Jacksons

with a more complete medical and social history.

¶66  Section 40-8-122, MCA, provides that:

   (1) Upon the filing of a petition for adoption the court shall order an
   investigation to be made by the [State] or by a licensed child-placing agency
   or other person named by the court . . . . The report of investigation shall be
   filed with the court by the investigator at the time the petition is filed or within
   30 days from the issuance of the order for investigation, unless the time
   therefor is extended by the court.  The report of the investigation shall state:
       . . . .
       (c)  that medical and social histories have been provided to the
   adoptive parent . . . .

¶67  As the State correctly notes, § 40-8-122, MCA, does not specifically identify that
information which the State must include in the medical and social histories it prepares, and
does not explicitly mandate disclosure of any psychological records regarding a child's birth
parents.  The State argues that it did disclose other background information to the Jacksons
and that it thus complied with the disclosure requirements of § 40-8-122, MCA.

¶68  Although § 40-8-122(1), MCA, does not specifically describe that information which
the State must include in the medical and social histories it provides to adoptive parents, the
State's own policies and procedures manual provides additional detail.  The Department of
Social and Rehabilitation Services Policies and Procedures Manual (Manual) § CSD-SS
602-1 specifically provides that:
   Preparation for adoptive placement is a team process involving the child with
   his social worker, foster parents, birth parents, adoptive parents and resource
   worker.  The child's social worker is the primary person in the process.

   The child and his adoptive family need to have all available information on the
   child and his birth family.  This information shall include:

   1.   Background information on biological parents . . .;
   2.   Daily schedules . . .;
   3.   Child's Social Study with identifying information removed;
   4.   Current child's medical record . . .;
   5.   Life story book;
   6.   Psychological evaluation;
   7.   School records; and
   8.   Social Security number.

¶69  Moreover, § CSD-SS 601-1 of the Manual describes the State's philosophy regarding
adoption as follows:
   The placement of children for adoption should have as its main objective the
   well-being of the children.  The needs of the child should be the primary
   determinant of the total service with full recognition of the interdependent
   needs and interests of the birth parents and adoptive parents.

¶70  The Jacksons argue that § 40-8-122(1)(c), MCA, construed in conjunction with the
State's own policy and procedures manual, imposed upon the State a statutorily constructed
duty to disclose  the psychological reports allegedly withheld in this case.
¶71  Although the State's policy and procedures manual does not specifically
require that
the State disclose psychological evaluations performed on an adoptee's biological parents,

it explicitly recognizes that the child and his adoptive family need to have "all available information on the child and his birth family."  This language, coupled with that portion of § 40-8-122(1)(c), MCA, which mandates that the State provide adoptive parents with "medical and social histories" clearly evidences a statutory duty on the part of the State to fully and accurately disclose all relevant information, including psychological reports, regarding an adoptee and his or her family.

¶72   The State next argues, however, that the imposition of such a duty to disclose, on either a common law or statutory basis, would conflict with its statutory duties to maintain the confidentiality of the birth parents' medical records.  In support of this contention, the State points to that version of § 41-3-205, MCA (1985), in effect at the time of Aaron's adoption by the Jacksons in 1985, which prohibited the State from disclosing information contained in child protection services files to anyone unless authorized by court order.

¶73   Although § 41-3-205, MCA, generally prohibited the State from disclosing information contained in child protective services files, it provided an exception permitting such dissemination if authorized by court order.  Had it obtained such an order from the court in this case, the State could have complied with the confidentiality requirements of § 41-3-205, MCA, while at the same time complying with its own policy of providing an adoptive family with "all available information on the child and his birth family" and with its statutory mandate to provide adoptive parents with meaningful "medical and social histories."  Had the State sought, but failed to obtain, such a court order, the State could still
have complied with the confidentiality requirements of § 41-3-205, MCA, and its own policy by simply informing the Jacksons that Aaron would not have been an appropriate child for them to adopt in light of their concerns regarding a possible history of mental illness.

¶74   Thus, although we recognize the various privacy considerations at issue in this case, we nevertheless conclude that § 40-8-122(1)(c), MCA, construed in conjunction with the State's own policy and procedures manual, gives rise to a statutorily imposed duty on the part of the State to fully and accurately disclose to the Jacksons all relevant background information in its possession, including any reports regarding the psychological health of Aaron's birth parents.  Whether the State breached that duty is a genuine issue of material fact precluding summary judgment in the State's favor on the Jacksons' claims for negligent nondisclosure and negligence based upon a lack of informed consent.

ISSUE 2

¶75   Did the District Court err in implicitly concluding the State sufficiently established the absence of any genuine issue of material fact regarding a causal connection between the State's allegedly negligent conduct and the Jacksons' injuries?

¶76   In light of our conclusion that the District Court erred in holding the State had neither a common law nor a statutory duty to fully and accurately disclose to the Jacksons certain information regarding the psychological background of their adoptive son's birth mother and putative father, we must next determine whether the court similarly erred in concluding that the State established the absence of any genuine issue of material fact with respect to the element of causation.

¶77   As the party moving for summary judgment in this case, the State has the initial burden of demonstrating "that no genuine issues of material fact exist."  Bruner, 272 Mont. at 264-65, 900 P.2d at 903.  Only if the State has done so, does "the burden then shift[] to the [Jacksons] to prove by more than mere denial and speculation that a genuine issue does

exist."  Bruner, 272 Mont. at 264-65, 900 P.2d at 903.


¶78  In its order granting the State's motion for summary judgment, the District Court held that "[t]he proof advanced by [the Jacksons] is insufficient to satisfy their burden of proving causation."  The court concluded Dr. Blodgett's proposed testimony was insufficient to meet the Jacksons' burden of establishing that the State's conduct helped "produce the injury complained of" because it failed to adequately demonstrate that "the information allegedly withheld by the [State] relative to the child and his heredity is causally connected to the child's current medical condition." Implicit in the court's conclusion that the Jacksons failed to demonstrate the presence of a genuine issue of material fact with respect to the question of causation, is its initial determination that the State satisfied its preliminary burden of establishing the absence of any such genuine issue of material fact.  This portion of the court's analysis rests upon its determination that proof of causation in the present case will ultimately require the Jacksons to demonstrate that the emotional and psychological condition of Aaron's birth mother and putative father caused Aaron's present condition.


¶79  On appeal, the Jacksons argue the court incorrectly interpreted the element of causation as it applies to their claims, and erred in holding that, to withstand the State's motion for summary judgment and to ultimately prevail in this suit, they must demonstrate, by way of expert testimony, that the emotional and psychological condition of Aaron's birth mother and putative father caused his present condition.  Rather, the Jacksons argue that to demonstrate causation they need only establish that, but for the State's conduct in either withholding or misrepresenting certain information, the Jacksons would not have adopted Aaron and, consequently, would have suffered no injuries.


¶80  Indeed, pursuant to our decision in Busta, we will no longer consider foreseeability as an element of causation.  Rather,
    [i]n those cases which do not involve issues of intervening cause, proof of causation is satisfied by proof that a party's conduct was a cause-in-fact of the damage alleged.  As stated in Prosser and Keaton on Torts  41, at 266 (5th ed. 1984), a party's conduct is a cause-in-fact of an event if "the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it."

Busta, 276 Mont. at 371, 916 P.2d at 139.


¶81  Furthermore, in Busta, we clarified that the appropriate causation instruction is as follows: "The defendant's conduct is a cause of injury if it helped produce it and if the injury would not have occurred without it."  Busta, 276 Mont. at 371, 916 P.2d at 139.


¶82  Thus, to demonstrate causation in the present case, the Jacksons will have to first establish that the State's conduct, in withholding or misrepresenting information regarding Aaron's background, helped produce their injuries.  The Jacksons will also have to demonstrate that they would have suffered no injuries but for the fact that the State withheld or misrepresented  that background information.


¶83  To specifically define causation in the present case, we must first identify the injury and resulting damages for which the Jacksons seek to recover by way of the present suit. Quite simply put, the general allegation upon which the Jacksons rest their suit is that the State withheld and misrepresented material facts regarding Aaron's biological family and, thereby, caused the Jacksons to adopt a child they would not have otherwise adopted.  The Jacksons allege they have been injured because they adopted a child they would not have chosen to adopt had they been fully and accurately informed, and assert they have suffered

emotional and financial damages as a result of the adoption.

¶84   We thus conclude the District Court erred in defining the injury claimed by the Jacksons in this case solely as "the emotional distress and financial responsibility for medical attention."  More accurately, the injury claimed by the Jacksons is the fact that they adopted a child they would have chosen not to adopt had they been aware of his family background. The ensuing emotional distress and financial responsibilities they allege are damages resulting from this injury.  Thus, although the State argues that "[w]hether or not the Jacksons would have adopted Aaron is not the issue," we conclude precisely the opposite.

¶85   We note that portion of the District Court's order in which it reasoned that, "if it were determined that [the State] failed to disclose or misrepresented certain facts about Aaron's background or concerning his natural mother's and father's mental conditions, and Aaron later developed a medical disorder such as diabetes, the [State's] failure to disclose would certainly bear no relationship to his diabetes and the plaintiffs' resulting expenses incurred in connection with the treatment of such condition."  We agree that for the State to face liability in such a situation would be to, in effect, hold it responsible for its obvious inability to offer prospective parents a guarantee regarding any particular child's future health. We conclude, however, that the element of foreseeability, properly considered by this Court in determining whether or not there exists a duty in any given case, sufficiently restricts the State's potential liability in such situations.  Here, we have concluded that, in light of the information the State had regarding the psychological and emotional health of Aaron's birth mother and putative father, the State could reasonably have foreseen that Aaron would manifest his present array of psychological and emotional problems.

¶86   Indeed, a number of other courts have recognized that, in the adoption context, the tort of negligent misrepresentation "is sufficiently restricted by the common law notion of foreseeability as found in the concepts of duty and proximate cause to prevent it from becoming in any way a guarantee or warranty of a child's future health."  Gibbs, 647 A.2d at 891.  See also, Mohr, 653 N.E.2d at 1113.

¶87   Furthermore, although those "wrongful adoption" cases from other jurisdictions provide little guidance on the question of causation, we note that the adoptive parents in several cases testified that they would not have adopted the child had they received full and accurate information regarding the child's familial background.  See, e.g., Mohr, 653 N.E.2d at 1109; Burr, 491 N.E.2d at 1105 (plaintiffs stated they would not have adopted the child had it not been for the defendants' fraudulent conduct); Mallette, 661 A.2d at 71.

¶88   Based on the foregoing, we conclude that, to demonstrate a causal connection between the State's conduct and their alleged injury, the Jacksons will ultimately need to demonstrate that the State's conduct in allegedly withholding or misrepresenting information regarding Aaron's background led to their decision to adopt Aaron and thereby helped produce the injury in this case.   Moreover, we hold the Jacksons will have to demonstrate that, but for the fact that the State withheld and misrepresented certain background information, they would not have adopted Aaron, would not have been injured, and would not have incurred the damages they now claim.

¶89   We hold the District Court, relying on an incorrect standard for causation, erred in placing the burden upon the Jacksons to demonstrate the presence of a genuine issue of material fact and in concluding they failed to sustain that burden.  Instead, we hold the State has failed to demonstrate the absence of a genuine issue of material fact with respect to the question of whether the Jacksons would have adopted Aaron had it not been for the State's

conduct in allegedly withholding or misrepresenting information regarding Aaron's background.

¶90   For the reasons stated above, we reverse the District Court's order granting the State's motion for summary judgment, and remand for further proceedings consistent with this opinion.

/S/   JIM REGNIER

We Concur:

/S/   J. A.   TURNAGE
/S/   KARLA M. GRAY
/S/   W. WILLIAM LEAPHART
/S/   WILLIAM E. HUNT, SR.
/S/   JAMES C. NELSON

Justice Terry N. Trieweiler specially concurring.

¶91   I concur with the result of the majority opinion; however, I would not engage in the majority's analysis of whether the State of Montana, through its Department of Family Services, had a common law duty to disclose information in its possession regarding the adopted child's family history of mental illness or emotional disturbance.

¶92   Analysis of a common law duty, based on our prior cases, involves a cumbersome and subjective analysis of foreseeability and public policy.  That analysis is unnecessary in this case because it has already been done by the Legislature and the Department of Social and Rehabilitation Services.  Furthermore, the discussion related to that analysis infers that every case alleging nondisclosure of information will have to be individually evaluated for a causal relationship between the information withheld and the adopted child's condition.  None of that analysis is necessary because of the statutory and regulatory obligation imposed on the Department which is noted in the majority opinion.

¶93   I concur with the majority that the State had a duty, pursuant to  40-8-122, MCA, to disclose medical information and the social history of the adopted child and his biological parents.  By administrative rule, that information was to include background information on the biological parents.  Certainly, in light of the adoptive parents' inquiries in this case, the most significant background information regarding these biological parents related to their mental health.

¶94   We have previously held that statutes establish a duty.  It is assumed that when the Legislature enacts statutes, or administrative agencies enact rules, they do so because of the foreseeability of harm if the statute or rule is not followed.  It is also assumed that statutes, and administrative rules which are consistent with those statutes, are a reflection of public policy in Montana.  Therefore, I conclude that once having determined that the State of Montana had a statutory duty to disclose the medical and psychological history of the adopted child's biological parents, it was unnecessary to discuss whether, under the circumstances in this case, there was also a common law duty.  I furthermore conclude that by reaching the issue of whether there was a common law duty, the majority has encouraged the trial courts and bar to analyze each similar claim on a case-by-case basis to determine whether, in fact, a causal connection can be established between the information withheld and the condition of the adopted child when, in fact, such an analysis is irrelevant to the establishment of the duty imposed by statute in Montana.

¶95   For these reasons, while I concur with the majority's conclusion that the State of

Montana had a duty to disclose all relevant medical and psychological information about the adopted child and his biological parents, I conclude that it is unnecessary to discuss whether that duty arises by common law.  Therefore, I specially concur with the majority opinion.

/S/   TERRY N. TRIEWEILER