DA 09-0404

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 291

WESTERN SECURITY BANK and GLACIER
BANCORP, INC.,

      Plaintiffs and Appellants,

v.

EIDE BAILLY LLP,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 07-1463
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            Kyle A. Gray (argued), W. Scott Mitchell, and Robert L. Sterup; Holland &
Hart LLP, Billings, Montana

      For Appellee:

            W. Anderson Forsythe, Moulton Bellingham PC, Billings, Montana

            Peter A. Koller (argued) and Thomas J. Shroyer, Moss & Barnett,
Minneapolis, Minnesota

Argued and Submitted:   June 10, 2010
Decided:   December 30, 2010

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Glacier Bancorp, Inc. (Glacier) appeals the order of the Thirteenth Judicial District Court, Yellowstone County, granting summary judgment to Eide Bailly LLP (Eide). Western Security Bank (Western) appeals the judgment of the District Court awarding a special jury verdict in favor of Eide. We affirm in part, reverse in part, and remand for further proceedings.

¶2 We review the following issues on appeal:

¶3 *Did the District Court properly grant summary judgment to Eide based upon its conclusion that Eide did not owe Glacier a duty of care?*

¶4 *Did Glacier fail to plead with sufficient particularity its fraudulent misrepresentation claim?*

¶5 *Did Western's fraudulent misrepresentation claim and its negligent misrepresentation claim fail to state claims upon which relief could be granted?*

FACTUAL AND PROCEDURAL BACKGROUND

¶6 Intermountain Mortgage Company (IMC) was a Montana corporation in the business of lending money to home purchasers. IMC borrowed money for its home loans through a warehouse line of credit from First Citizens Bank (FCB). FCB was a subsidiary of Citizens Development Corporation (CDC). The lending agreement between IMC and FCB required IMC to procure for FCB's benefit an annual audit of its balance sheet and income statement to be performed by a certified public accounting firm. FCB used the audit reports yearly in deciding whether to renew, and for how much, IMC's warehouse line of credit. IMC chose

2

Eide to perform the audits. Eide began performing the annual audits of IMC's financial statements in 1989. Eide never entered any contractual agreements with FCB, CDC, Glacier, or Western.

¶7 Eide agreed to perform the annual audits in accordance with generally accepted accounting principles. Eide's engagement letter had informed that "because we will not perform a detailed examination of all transactions, there is a risk that a material misstatement may exist and not be detected by us." Eide further agreed to render an opinion on the fairness of IMC's financial statements. Eide's audits resulted in the issuance of "unqualified opinions" regarding IMC's financial statements. An unqualified opinion represents with reasonable assurance, rather than absolute assurance, that the audited financial statements do not contain material misstatements.

¶8 CDC announced in November 2005 that it would be selling its stock. Glacier investigated whether to purchase CDC. Glacier, a bank holding company, owns subsidiary banks in Montana and several other western states. Glacier reviewed the financial information of CDC's subsidiary banks, including FCB. Glacier reviewed Eide's most recent audit reports of IMC as part of its due diligence investigation.

¶9 Glacier publicly announced its merger with CDC on April 20, 2006. The sale closed on September 30, 2006. Glacier merged FCB into Western, its existing Montana state-chartered subsidiary bank. Western took over the line of credit to IMC that FCB previously had issued. IMC disclosed on February 8, 2007, that its chief financial officer, Angela Hakala (Hakala), had been manipulating the financial records of IMC.

3

¶10 Hakala's financial manipulation concealed the diversion of approximately $7.2 million that had been used to support IMC's business operations. Hakala's manipulation of funds had occurred during the years when Eide had issued unqualified opinions of IMC's financial statements. Hakala's misconduct had led IMC to overstate its assets, income, and profits. Hakala's misconduct left IMC unable to repay its loans to Western.

¶11 Glacier and Western filed a joint complaint against Eide on November 21, 2007, that contained a single count entitled professional negligence. Glacier and Western claimed that they had relied upon Eide's audit reports of IMC's financial statements in the purchase of CDC. Glacier and Western alleged that IMC's deposits and loans with FCB "constituted a substantial portion" of CDC's deposits and that Glacier had relied upon the accuracy of Eide's audit reports in establishing a price for the purchase of CDC.

¶12 Glacier moved for partial summary judgment on April 14, 2008. Glacier sought a declaration regarding the duty of care that accountants owe to third parties when no privity of contract exists between the parties. Eide responded with a cross-motion for summary judgment. Eide argued that its auditors owed no duty of care to third parties like Glacier due to a lack of "near privity" between the parties and because Eide had not intended to have Glacier use the audit reports in evaluating the merger with CDC.

¶13 The parties disputed specifically the applicability of this Court's decisions in *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784 (1990), and *Jim's Excavating Service v. HKM Associates*, 265 Mont. 494, 878 P.2d 248 (1994). The District Court determined that the near privity rule from *Thayer* applied to Glacier's claim. The court granted summary judgment to

4

Eide on the grounds that Glacier had failed to establish that Eide owed it a duty under the *Thayer* near privity approach, or, alternatively, under the *Restatement (Second) of Torts* § 552 (1977) approach.

¶14 Glacier further argued that its complaint alleged a fraudulent misrepresentation claim. The District Court dismissed Glacier's fraudulent misrepresentation claim for insufficient pleading and noted that "the word fraud is absolutely absent from the Complaint." These summary judgment rulings of August 6, 2008, effectively ended Glacier's involvement with the litigation before the District Court.

¶15 Western, who had not been a party to the cross-motions for summary judgment, filed an amended complaint on October 8, 2008. Western added a claim for negligent misrepresentation and a claim for fraudulent misrepresentation. The court dismissed the two new claims on the basis that they failed to state a claim upon which relief could be granted.

¶16 Western proceeded to trial. Trial lasted nine days. The court instructed the jury to determine Eide's duty of care to Western according to the *Thayer* near privity standard. The jury returned a special verdict finding that Eide owed Western a duty of care and that both Western and Eide had been causally negligent. The jury allocated seventy percent causal negligence to Western and thirty percent causal negligence to Eide.

¶17 Western appeals the court's application of the *Thayer* standard, appeals the dismissal of its negligent misrepresentation claim and its fraudulent misrepresentation claim, and seeks a new trial based upon various evidentiary rulings and the court's jury instructions. Glacier

appeals the court's summary judgment ruling and the court's dismissal of its fraudulent misrepresentation claim.

STANDARD OF REVIEW

¶18     We review de novo a district court's grant or denial of a summary judgment motion. *Cole v. Valley Ice Garden LLC*, 2005 MT 115, ¶ 4, 327 Mont. 99, 113 P.3d 275.  We review de novo a district court's ruling on a motion to dismiss pursuant to M. R. Civ. P. 12(b)(6). *Cowan v. Cowan*, 2004 MT 97, ¶ 10, 321 Mont. 13, 89 P.3d 6.  This Court will not disturb a district court's ruling on the grant or denial of a motion to amend the pleadings absent an abuse of discretion.  *Stipe v. First Interstate Bank-Polson*, 2008 MT 239, ¶ 27, 344 Mont. 435, 188 P.3d 1063.  We review jury instructions in their entirety in order to determine if they fully and fairly instruct the jury on the law applicable to the case.  *Peterson v. St. Paul Fire & Marine Ins. Co.*, 2010 MT 187, ¶ 22, 357 Mont. 293, 239 P.3d 904.  We conduct plenary review to the extent the district court bases its discretionary ruling upon a conclusion of law.  *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 26, 351 Mont. 464, 215 P.3d 649.

DISCUSSION

¶19     *Did the District Court properly grant summary judgment to Eide based upon its conclusion that Eide did not owe Glacier a duty of care?*

¶20     The District Court concluded that the *Thayer* near privity approach controlled the issue of whether Eide owed Glacier a duty of care.  The court granted summary judgment to Eide in light of its determination that Eide did not know or intend that Glacier would rely on

6

Eide's audit reports in the Glacier-CDC merger transaction. The court alternatively concluded that Eide did not owe Glacier a duty of care under the *Restatement (Second) of Torts* § 552.

¶21    We first draw a distinction between a claim against an accountant for professional negligence and a claim against an accountant for negligent misrepresentation. The California Supreme Court recognizes the tort of professional negligence as "separate and distinct" from the tort of negligent misrepresentation. *Bily v. Arthur Young & Co.,* 834 P.2d 745, 768 (Cal. 1992). This Court has not squarely addressed the issue. This Court instead has assumed that the two claims represent separate causes of action. *May v. ERA Landmark Real Est.,* 2000 MT 299, ¶¶ 42-43, 302 Mont. 326, 15 P.3d 1179; *Durbin v. Ross*, 276 Mont. 463, 472, 916 P.2d 758, 763-64 (1996).

¶22    A professional negligence claim asserts that the accountant negligently performed its professional services. These professional services often involve the performance of an audit. The plaintiff in any professional negligence action "must prove that the professional owed him a duty, that the professional failed to live up to that duty," and that the professional's failure caused damages to the plaintiff. *Carlson v. Morton*, 229 Mont. 234, 238, 745 P.2d 1133, 1136 (1987).

¶23    A negligent misrepresentation claim asserts, in contrast, that the plaintiff justifiably relied on false information negligently provided by an accountant. False information provided by an accountant often appears in an audit report. This Court has recognized a

7

common law tort of negligent misrepresentation. *Jackson v. State,* 1998 MT 46, ¶ 36, 287 Mont. 473, 956 P.2d 35.

¶24 The Court also has approved the definition of negligent misrepresentation found in the *Restatement (Second) of Torts* § 552 in the professional context. *May,* ¶ 61 (upholding a negligent misrepresentation claim against a real estate agent who altered a contract document); *Durbin*, 276 Mont. at 472, 916 P.2d at 764 (recognizing a negligent misrepresentation claim when a realtor allegedly misrepresented facts to a buyer about the legality of a septic system); *St. Bank of Townsend v. Maryann's, Inc.,* 204 Mont. 21, 33, 664 P.2d 295, 301 (1983) (approving a negligent misrepresentation claim against a bank in a promissory note dispute); *Jim's Excavating Serv.,* 265 Mont. at 504-05, 878 P.2d at 254 (concluding that a § 552 claim should control the issue of a designer's liability to an unknown contractor who relies on the designer's plans and specifications).

¶25 Glacier's complaint contained a single count under the heading "Professional Negligence." Glacier asserted a third-party claim against Eide. Glacier sought partial summary judgment regarding what duty of care an accountant owes to a third party. Glacier does not assert a professional relationship. "[T]here can be no claim of professional negligence," without a duty arising from a professional relationship. *Durbin,* 276 Mont. at 472, 916 P.2d at 763.

¶26 Glacier's complaint set out allegations that Eide supplied false information in Eide's audit reports of IMC. Glacier alleged that Eide produced overstated audit reports, falsely represented that IMC financial statements had been prepared in accordance with generally

8

accepted accounting principles, and provided unqualified opinions that Glacier had relied upon in a merger transaction. Glacier asserted that Eide negligently produced audit information that failed to disclose that IMC had used funds for purpose other than paying down the line of credit. Glacier claimed that its justifiable reliance on Eide's audit reports caused it to suffer money damages. Glacier's claim more properly should be classified as one for negligent misrepresentation despite the "Professional Negligence" label in its complaint. *Id.*, 916 P.2d at 763-64.

¶27    This Court has treated professional negligence claims according to § 552 standards when the third party essentially alleges reliance on misrepresentations of information. *Jim's Excavating Serv.,* 265 Mont. at 504-05, 878 P.2d at 254. The Court there concluded "that in this case, and in other cases wherein a contractor brings a suit against the project engineer or architect, the approach set forth in § 552 of the Restatement should control." *Id.* at 504, 878 P.2d at 254. Other jurisdictions have followed § 552 when a plaintiff asserts a claim for professional negligence based on alleged negligence in supplying information. The Supreme Court of New Jersey noted that the plaintiffs' claim "can be viewed as grounded in negligent misrepresentation" even though the plaintiffs directed their theory at the service performed by the accountant. *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 142 (N.J. 1983) (superseded by statute on other grounds). The California Supreme Court concluded that a claim presents a cause of action in negligent misrepresentation when the third party alleges reliance on the audit report itself rather than on the performance of the actual audit. *Bily*, 834 P.2d at 772.

9

¶28 The District Court did not distinguish a professional negligence claim from a negligent misrepresentation claim. The District Court simply determined that the *Thayer* near privity standard controlled the issue of an accountant's duty to third parties. We conclude that Glacier has asserted a third-party negligent misrepresentation claim against Eide. The Dissent claims that the Court's characterization of Glacier's claim essentially has "remade" Glacier's claim on appeal. We disagree. We have done nothing more than identify the law applicable to the undisputed facts. *Slauson v. Marozzo Plumbing & Heating*, 2009 MT 333, ¶ 13, 353 Mont. 75, 219 P.3d 509. The title that a party attaches to a legal claim in a pleading does not bind our analysis, particularly when the party otherwise has failed to allege facts to support the improperly titled claim. Glacier and Eide have requested that this Court define the scope of liability stemming from their relationship. We have committed no more impropriety here than any court would in refusing to allow a litigant with a products liability claim to sue for "ordinary negligence." *See Dayberry v. City of E. Helena,* 2003 MT 321, ¶¶ 22-23, 318 Mont. 301, 80 P.3d 1218. Likewise, this Court has refused to allow a workers' compensation claimant to circumvent the exclusivity provision by giving an ordinary negligence claim a title of intentional battery. *Alexander v. Bozeman Motors, Inc.*, 2010 MT 135, ¶ 32, 356 Mont. 439, 234 P.3d 880.

¶29 The Dissent denounces our refusal to be misled by the "Professional Negligence" title as "especially egregious, given that Glacier actually eschews the Restatement's approach." The record reveals, however, that Glacier alternatively advocated for the Restatement approach, including its request to the District Court in its reply brief that "the Court should

find that: (1) the § 552 standard governs [Glacier's] claims." We doubt Glacier will experience the surprise exclaimed by the Dissent, given that the District Court found it necessary to conduct an alternative analysis and reach an alternative conclusion that Glacier had not satisfied its burden of proof to survive summary judgment under the *Restatement (Second) of Torts* § 552 approach.

¶30     The facts do not present, and we do not address, the issue of an accountant's liability to third parties under a general theory of professional negligence, as the Dissent would have us do. We instead address the appropriate duty of care that an accountant owes to a third party who asserts a claim for negligent misrepresentation. We decline to address the Dissent's arguments on this point other than to state that we simply will not further develop third-party professional negligence law until presented with a factual dispute that actually gives rise to such a claim.

¶31     The *Restatement (Second) of Torts* § 552 defines the cause of action for negligent misrepresentation that plaintiffs may assert against those who negligently obtain and communicate false information. This Court followed the *Restatement (Second) of Torts* § 552 approach in *Jim's Excavating Service* for professional negligence suits against engineers and architects who had supplied information as part of their services. *Jim's Excavating Serv.*, 265 Mont. at 504-05, 878 P.2d at 254. The Court concluded that the engineering firm owed a duty of care to noncontractual contractors when it had supplied design plans and specifications for a project even though the specific identity of the contractors had not been known at the time that the firm supplied the information. *Id.* at 506,

11

878 P.2d at 255. The Court determined that the firm "knew or should have foreseen" that *some* contractor eventually would rely on the firm's plans and specifications. *Id*.

¶32 Under § 552, the noncontractual third party does not have to be actually known or specifically identified at the moment the accountant supplies the information. *Restatement (Second) of Torts* § 552 cmt. h. Liability may attach if an accountant intends the information to influence one "who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." *Id*. A member of the larger class of persons who might learn of the information through the ever-present possibility of repetition and circulation of information, however, could not hold the accountant liable. *Id.*

¶33 Comment a to § 552 further informs that not every user of commercial information may hold the professional who supplied the information to a duty of care. *Id.* at cmt. a. "[T]he use to which the information will be put" defines the scope of the duty of care when supplying commercial information. *Id*. A third party who relies on information may hold the supplier of that information to a duty of care in circumstances only in which the supplier had been "manifestly aware of the use to which the information was to be put and intended to supply it for that purpose." *Id.*; *Jim's Excavating Serv.*, 265 Mont. at 505-06, 878 P.2d at 254-55.

¶34 Section 552(2) limits an accountant's liability for negligent misrepresentation claims. Section 552(2)(a) limits liability to parties for whose benefit the accountant intends to supply the information and to parties whom the accountant knows will receive the

information through the intended, benefitting parties. Section 552(2)(b) further limits liability to parties who rely on the information in a transaction that the accountant intended or knew the information would influence. This approach protects accountants from unforeseen liability exposure when the recipients circulate the information to unforeseeable parties and when the recipients use the information in unforeseeable transactions. *Restatement (Second) of Torts* § 552 cmts. a, j.

¶35 We routinely have applied § 552 to claims for negligent misrepresentation. *Durbin*, 276 Mont. at 472, 916 P.2d at 764; *Jim's Excavating Serv.*, 265 Mont. at 504-05, 878 P.2d at 254; *St. Bank of Townsend*, 204 Mont. at 33, 664 P.2d at 301. The parties have presented no compelling reasons why we should decline to apply § 552 here. We turn then to analyze whether Eide owed Glacier a duty of care on Glacier's negligent misrepresentation claim according to the standards set forth in § 552.

¶36 Glacier and Eide filed cross-motions for summary judgment on an accountant's duty to third parties. Both parties filed affidavits in support of their motions. Eide presented the affidavit of John Jacobsen, Eide audit partner, in which Jacobsen declared that Eide had not intended or known that Glacier would rely upon any of its audit reports. Jacobsen attached to his affidavit the engagement agreement between Eide and IMC. Jacobsen acknowledges that, beginning in 1995, IMC funded its mortgage operations primarily through a warehouse lending agreement that it had arranged with FCB. Jacobsen emphasizes, however, that Eide never intended that the audit reports would be used to evaluate a possible merger transaction.

Jacobsen further states that Eide had not been aware that IMC or other recipients of the audit reports would use the audit reports to influence Glacier in a merger transaction.

¶37 Jacobson's affidavit shifted the burden to Glacier to provide substantial evidence that raises a genuine issue of material fact regarding Eide's intent or Eide's knowledge as to Glacier's use of the audit reports in evaluating the merger transaction. Glacier filed two affidavits—one from its expert witness and one from its own counsel. Glacier's expert, Larry Barton, opined that Eide "knew or should have known" that the audit reports "likely" would be circulated to financial institutions who did business with IMC, including Glacier. Barton opines that Eide should have known that IMC could be acquired by Glacier in light of the fact that Eide holds itself out as a Top 25 Accounting Firm.

¶38 Barton's position potentially could expose Eide to liability to an infinitely large class of possible users of the audit reports in transactions ranging from warehouse lending agreements to merger transactions. The *Restatement* approach may not require that Glacier's specific identity be known to Eide at the time Eide issued the audit reports. *Restatement (Second) of Torts* § 552 cmt. h; *Jim's Excavating Serv.*, 265 Mont. at 504, 878 P.2d at 254. The *Restatement* does require, however, that Glacier be one for "whose benefit and guidance" the information is supplied, and not merely one of the many potential persons to whom the audit reports could be circulated. *Restatement (Second) of Torts* § 552 cmt. h.

¶39 Barton can do no more than speculate that Eide "likely" should have known that FCB would supply the audit reports to Glacier. Barton's affidavit failed to rebut Eide's claim that it had not known that FCB would provide the audit reports to Glacier for use in evaluating

14

the merger transaction. Barton and Glacier have not provided evidence that Eide had been "manifestly aware of the use to which the information was to be put" or that Eide "intended to supply it for that purpose." *Id.* at cmt. a; *Jim's Excavating Serv.*, 265 Mont. at 505-06, 878 P.2d at 254-55.

¶40 Glacier also filed a M. R. Civ. P. 56(f) affidavit from its counsel, who claimed that ongoing discovery would reveal the essential facts that would preclude summary judgment in Eide's favor. Mere speculation as to what future discovery would reveal fails to give rise to genuine issues of material fact sufficient to meet Glacier's burden. *Envtl. Contrs. LLC v. Moon,* 1999 MT 178, ¶ 19, 295 Mont. 268, 983 P.2d 390. Glacier had over eight months to uncover some information that would indicate that Eide had known that the audit reports would end up in Glacier's hands. Glacier itself brought this issue to a head when Glacier filed its motion for summary judgment on the issue of Eide's duty. Glacier cannot complain of insufficient time to conduct discovery.

¶41 Glacier did not provide an affidavit from any of its own representatives who could assert that Eide had known that Glacier would rely on the audit reports. No affidavit from any representatives of FCB, CDC, IMC, or Western likewise asserted that Eide knew or intended that the audit reports would be supplied to Glacier. Finally, Glacier did not submit any information to suggest that Eide knew that IMC and FCB intended to circulate the audit reports to third parties.

¶42 Glacier failed to establish that its claim satisfied either of the requirements of *Restatement (Second) of Torts* § 552(2). Glacier does not qualify as "one of a limited group

15

of persons" intended or known by Eide to be receiving the audit reports. *Restatement (Second) of Torts* § 552(2)(a). Glacier stands as a member of the greater class to whom Eide owed no duty of care, even though the information in Eide's audit reports may have been repeated to Glacier and even though Glacier may have relied on the information. *Id.* at cmt. h. Eide did not intend, and did not know that IMC intended, to circulate the audit reports to the parties of the Glacier-CDC transaction.

¶43    Eide understood that "the use" to which the audit reports would be put involved the suitability and scope of the warehouse lending agreement. No evidence established that Eide understood that its audit reports would be used to evaluate a merger transaction. *Id.* at cmt. a. The merger transaction is not "substantially similar" to the warehouse lending agreement between IMC and FCB. *Id.* at § 552(2)(b). Glacier's reliance on the audit reports in its merger transaction constitutes a use different than the use for which Eide had supplied the information and one for which Eide does not owe Glacier a duty of care.

¶44    The Dissent seems to agree that the *Restatement (Second) of Torts* § 552, as adopted and applied in *Jim's Excavating Service,* applies here. The Dissent apparently parts ways with the Court over the interpretation of the phrase "knew or should have foreseen." The Dissent interprets this phrase to mean the equivalent of the "reasonably foreseeable plaintiff" standard. Contrary to the Dissent's interpretation, the phrase "knew or should have foreseen" neither served as a litmus test in *Jim's Excavating Service,* nor reflected that Court's analysis.

16

¶45    The Court in *Jim's Excavating Service* adopted and applied the principles of the *Restatement (Second) of Torts* § 552. *Jim's Excavating Serv.*, 265 Mont. at 504-06, 878 P.2d at 254-55. The Court held that "a third party contractor may successfully recover for purely economic loss [. . .] when the design professional knew or should have foreseen *that the particular plaintiff or an identifiable class of plaintiffs* were at risk in relying on the information supplied." *Id.* at 506, 878 P.2d at 255 (emphasis added). The Dissent neglects to undertake the § 552 analysis applied in *Jim's Excavating Service* and further misrepresents its holding. Our § 552 analysis follows the analysis adopted in *Jim's Excavating Service*. Opinion, ¶¶ 24, 27, 31, 33, 35, 38-39. We have turned to principles set forth in § 552 and determined that Glacier has not set forth facts to establish that Eide should have identified Glacier as a plaintiff who might rely on the IMC audits that Eide provided for purposes of the warehouse lending agreement.

¶46    We also agree with the District Court that Glacier failed to raise any genuine issue of material fact as to whether Eide intended, or knew that IMC intended, that the audit reports would be used in the CDC-Glacier merger transaction. The District Court correctly granted summary judgment to Eide on Glacier's negligent misrepresentation claim under the *Restatement (Second) of Torts* § 552.

¶47    *Did Glacier fail to plead with sufficient particularity its fraudulent misrepresentation claim?*

¶48    The District Court determined that Glacier had failed to plead the elements of fraud with particularity as required under M. R. Civ. P. 9(b). Glacier argues that it pleaded with

17

particularity the elements of fraud, except intent, which it pleaded generally, as allowed by M. R. Civ. P. 9(b). Glacier argues in the alternative that the court should have ruled on its oral motion to amend the complaint that it raised during the summary judgment hearing.

¶49 This Court has determined that "[o]f primary importance in understanding the particularity requirement of Rule 9(b) is the recognition that it does not render the general principles set forth in Rule 8 entirely inapplicable." *Fraunhofer v. Price*, 182 Mont. 7, 14, 594 P.2d 324, 328 (1979) (citation omitted). M. R. Civ. P. 8(a) requires only "a short and plain statement of the claim" for relief. The sufficiency of a particular pleading under M. R. Civ. P. 9(b) often depends on the context in which the fraud is alleged to have occurred, how much detail is necessary to give adequate notice to an adverse party, and how much detail is necessary to enable an adverse party to prepare a responsive pleading. *Id.* at 15, 594 P.2d at 329.

¶50 The District Court concluded that Glacier had failed to plead fraud with particularity, in part, because the word "fraud" could be found nowhere in Glacier's complaint. We agree with Glacier that it necessarily need not have used the word fraud in its complaint. Glacier's argument that it intended to raise a fraud claim rings hollow, however, in light of the fact that its complaint contains one count, entitled "Professional Negligence." We reject Glacier's argument that all the elements of fraud sprinkled throughout general averments in its complaint rise to a degree sufficient to have provided Eide with notice of its intent to raise a fraudulent misrepresentation claim. *Id.*, 594 P.2d at 329. Glacier failed to plead fraudulent

18

misrepresentation with particular detail sufficient to put Eide on notice to prepare a responsive pleading. *Id.*, 594 P.2d at 329.

¶51 Glacier raised at the summary judgment hearing the possibility of filing an amended complaint to state its fraud claim with particularity. The District Court did not rule on Glacier's claimed motion to amend. The court apparently concluded that Glacier never made such a motion. Glacier argues on appeal that the court abused its discretion when it failed to rule on the motion to amend. Glacier argues that two months remained under the court's scheduling order to allow for amendments at the time of the summary judgment hearing. Glacier notes that M. R. Civ. P. 7(b) permits oral motions and that leave to amend a pleading "shall be freely given when justice so requires." M. R. Civ. P. 15(a).

¶52 Glacier never filed a written motion for leave to amend its complaint before, during, or after the oral argument on the cross-motions for summary judgment. Glacier referred several times at the hearing to the possibility of filing a motion to amend. For example, Glacier's counsel said, "so to the extent that we need to amend to add that complaint, we would seek the Court's leave now to go ahead and file an amended complaint to do that." Glacier's counsel later added that "we asked for leave to file an amended complaint that more specifically sets forth our fraudulent misrepresentation claim." The court noted that "[f]raud isn't in [the complaint], so you're going to have to run it up the flag pole again." Glacier's counsel replied, "[f]ine, Your Honor, we will do that." Finally, in Glacier's closing arguments, Glacier's counsel emphasized, "[s]o to the extent that we need to – we have asked your permission to file fraud with particularity, we will discuss that at a later time."

19

¶53 Nothing in the record indicates that Glacier ever pursued a motion to amend its complaint at a later time. The District Court did not construe the comments made by Glacier's counsel at the hearing to rise to the level of an oral motion to amend. The court analyzed the issue of whether Glacier had pleaded fraud with sufficient particularity on the only complaint before it. We cannot determine on the record before us that the court committed reversible error when it refused to rule on an oral motion to amend that Glacier never clearly made.

¶54 *Did Western's fraudulent misrepresentation claim and its negligent misrepresentation claim fail to state claims upon which relief could be granted?*

¶55 The Court reviews an appeal from a district court's order granting a motion to dismiss based on the sufficiency of the complaint. *Cowan,* ¶ 10. A court should not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts" in support of the claim that would entitle the plaintiff to relief. *Id.* We must construe the complaint in the light most favorable to the plaintiff when reviewing a motion to dismiss under M. R. Civ. P. 12(b)(6) and take as admitted all well-pleaded factual allegations. *Id.* The Court has no obligation, however, to take as true legal conclusions or allegations that lack factual basis. *Id.* at ¶ 14.

¶56 Western's amended complaint sets forth three counts: professional negligence, negligent misrepresentation, and fraudulent misrepresentation. Western may assert alternately or hypothetically "as many separate claims as [Western] has." M. R. Civ. P. 8(e). The District Court dismissed Western's fraudulent misrepresentation claim for failure to

plead the fraud claim with particularity. M. R. Civ. P. 9(b) requires a party to state with particularity "the circumstances constituting fraud or mistake." A party may allege generally, however, malice, intent, knowledge, and other condition of mind. M. R. Civ. P. 9(b). A party seeking to establish a fraud claim must plead the nine elements of fraud, including materiality of the representation and the speaker's intent that the receiving party should rely upon the representation. *Durbin,* 276 Mont. at 469, 916 P.2d at 762.

¶57   Though the allegations of fraud need be stated with particularity, we must read M. R. Civ. P. 9(b) in conjunction with the "short and plain statement" requirement of M. R. Civ. P. 8(a). *Fraunhofer,* 182 Mont. at 14, 594 P.2d at 328. This Court stated in *Fraunhofer* that "the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading" constitutes perhaps the most basic consideration in making a judgment as to the sufficiency of the pleading. *Id.* at 15, 594 P.2d at 329.

¶58   The District Court concluded that Western had not pleaded with particularity both materiality and "intent to injure." Western's complaint generally described the terms of the lending agreement and purpose for which IMC had procured the audit reports. Western specifically alleged that the warehouse agreement between IMC and FCB obligated IMC to procure an annual audit report for FCB's purposes and that Eide knew that IMC was obligated to provide the audit reports to FCB. Western specifically alleged that Eide had overstated amounts reported in the audit reports. Western specifically alleged that Eide discovered that funds had been misappropriated, but had failed to indicate knowledge of the

21

misappropriated funds in its unqualified audit reports. And finally, Western specifically alleged that FCB relied on Eide's unqualified reports when it increased IMC's line of credit from $7.5 million to $19.5 million over six years. Western separately pleaded that the allegedly false representations "were material to credit decisions made by FCB."

¶59 We must construe these factual allegations in the light most favorable to Western. *Cowan,* ¶ 10. Western recounted the allegedly false representations that resulted in its reliance on the audit reports. Western described the significance of the representations to its credit decisions and how the decisions led to its money damages. Western sufficiently pleaded the materiality of the allegedly false representations to satisfy the pleading requirement for fraudulent misrepresentation. *See May*, ¶ 26; *Batten v. Watts Cycle & Marine*, 240 Mont. 113, 118, 783 P.2d 378, 381-382 (1989).

¶60 Western also argues that the court improperly required Western to plead "intent to injure" as an element of its fraudulent misrepresentation claim. We agree. The court cited no authority for the "intent to injure" standard that it imposed on Western. Section 27-1-221, MCA, could be interpreted to require an "intent to injure" element as part of a claim for punitive damages based on actual fraud. M. R. Civ. P. 9(b) permits Western, however, to allege intent generally to support its claim for fraudulent misrepresentation.

¶61 Western only must plead factual allegations that Eide made a representation with the "intent it be relied upon" to satisfy the intent element of a prima facie fraud claim. *Durbin,* 276 Mont. at 469, 916 P.2d at 762; *May,* ¶ 21. Western alleged that Eide knew that IMC had procured the audit reports for FCB's use in renewing the warehouse line of credit. Western

22

further alleged that Eide had intended that FCB would rely on the representations contained in the audit reports.

¶62 M. R. Civ. P. 9(b) requires only that Western generally allege that Eide had intended for FCB to rely on its representations. *Durbin,* 276 Mont. at 469, 916 P.2d at 762; *May,* ¶ 21. The allegations in Western's amended complaint contained sufficient detail to have put Eide on notice that it should prepare a responsive pleading on Western's fraudulent misrepresentation claim. The District Court incorrectly imposed a heightened standard when it required Western to allege an "intent to injure."

¶63 The District Court also dismissed Western's negligent misrepresentation claim that Western included in its amended complaint. The court concluded this negligent misrepresentation claim simply duplicated Western's professional negligence claim. The court expressed concern that Eide would be subject to different standards of duty if the court permitted both the professional negligence claim and the negligent misrepresentation claim.

¶64 Western has alleged that Eide made false representations of material fact when it supplied unqualified audit reports of IMC's financial statements. Western has asserted that Eide negligently misrepresented IMC's financial condition when Eide failed to report IMC's conduct of covering older loans with proceeds from new loans. Western has alleged that Eide knew that FCB would rely on the representations and that Eide knew the audit reports would influence the warehouse lending agreement between IMC and FCB. Western further alleged that FCB in fact had relied on the representations in increasing the amount of the line of credit, and that Western, as successor to FCB, had suffered damages as a result of its

23

reliance. These allegations more properly set forth a cause of action for negligent misrepresentation. Opinion, ¶ 26. Proper classification of Western's claim as one for third-party negligent misrepresentation alleviates the District Court's concerns of repetitive claims and different duty standards.

¶65 The District Court's classification of Western's case as one for professional negligence resulted in its instruction to the jury on the *Thayer* near privity standard. Western argues that the court's instruction on the wrong duty standard presumptively prejudiced its case. Eide counters that even if the court instructed on the wrong duty standard, the error does not merit reversal because the jury found that Eide owed Western a duty of care under the narrower *Thayer* duty standard.

¶66 Eide's argument confuses the *Thayer* standard for the duty of care in third-party professional negligence claims with the *Restatement (Second) of Torts* § 552(2) standard for the duty of care in third-party negligent misrepresentation claims. Where a third party asserts a claim for negligent misrepresentation against an accountant, the court must instruct the jury according to the elements of a § 552 negligent misrepresentation claim. A § 552 claim includes the following elements: (1) the defendant supplied false information in the course of the defendant's business, (2) the defendant failed to exercise reasonable care in obtaining or communicating the information, (3) the plaintiff's justifiable reliance on the false information caused the plaintiff's financial loss, (4) the plaintiff was one of a limited group of persons for whose benefit and guidance the defendant intended to supply the information or knew that the recipient intended to supply it, and (5) the plaintiff relied on the

24

information in a transaction that the defendant knew the information would influence. *Restatement (Second) of Torts* § 552; *Batten,* 240 Mont. at 117, 783 P.2d at 381; *Weigand v. Mont. Land & Real Est. Inv.*, 223 Mont. 137, 139, 724 P.2d 194, 196 (1986).

¶67 We agree with Western that the trial court must instruct the jurors fully and correctly on the applicable law of the case. *Schuff v. Jackson*, 2002 MT 215, ¶ 38, 311 Mont. 312, 55 P.3d 387. The District Court's failure to instruct the jury fully and correctly on the applicable law of *Restatement (Second) of Torts* § 552 constitutes reversible error. *Id.* at ¶¶ 38-39. We reverse the District Court's judgment awarding a special verdict in Eide's favor and remand for a new trial at which the court must instruct the jury on Western's § 552 negligent misrepresentation claim. We need not address Western's various evidentiary claims and other challenges to the court's jury instructions in light of our decision to remand for a new trial.

**CONCLUSION**

¶68 We affirm the District Court's grant of summary judgment to Eide on all of Glacier's claims. Glacier failed to present any evidence to establish that Eide intended, or knew that

25

IMC intended, its audit reports to be used by Glacier or to be used in a merger transaction. Glacier failed to plead fraud with sufficient particularity.

¶69   We reverse the District Court's dismissal of Western's negligent misrepresentation claim and its fraudulent misrepresentation claim. We reverse the jury's special verdict in favor of Eide and remand for a new trial.


                                         /S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE




Justice James C. Nelson, concurring in part and dissenting in part.

¶70   I concur in the Court's resolution of Issue 2 and certain parts of Issue 3. I dissent, however, from the Court's decision as to Issue 1 and other parts of Issue 3.

**Issue 1**

¶71   The Court begins by drawing a distinction between a professional negligence claim and a negligent misrepresentation claim. Opinion, ¶¶ 21-24. The Court explains that a

26

professional negligence claim is an ordinary negligence action consisting of the traditional

four elements:

1. duty
2. breach
3. causation
4. damages

Opinion, ¶ 22. A negligent misrepresentation claim, in contrast, is governed by *Restatement*

*(Second) of Torts* § 552 (1977), hence prompting the moniker "§ 552 claim." Opinion,

¶¶ 23-24. It consists of five elements:

1. the defendant supplied false information in the course of its business
2. the defendant failed to exercise reasonable care in obtaining or communicating the information
3. the plaintiff's justifiable reliance on the false information caused the plaintiff's financial loss
4. the defendant intended to supply the information, or knew that the recipient of the information intended to supply it, for the benefit and guidance of a limited group of persons that included the plaintiff
5. the plaintiff relied on the information in a transaction that the defendant knew the information would influence

Opinion, ¶ 66. It should be noted that § 552's standard weighs in favor of the negligent

purveyor of false information, limiting liability to only those persons who the defendant

*intended* or *actually foresaw* would rely on the information in a *foreseen* transaction.

¶72    After distinguishing between these two causes of action, the Court takes Glacier's

four-element professional negligence claim and remakes it into a five-element negligent

misrepresentation claim. Opinion, ¶ 26. The Court then reviews Glacier's filings in support

of its motion for summary judgment and holds that Glacier has not satisfied the requirements

of a § 552 claim. Opinion, ¶¶ 37-42.

27

¶73 It will surely come as a surprise to Glacier, however, when it learns that it has lost this case because it failed to adequately support a claim that it never even raised! Glacier alleged, and has always pursued, a *professional negligence* claim against Eide, not the negligent misrepresentation claim contrived by the Court. As noted, in order to recover in a professional negligence action, the plaintiff must prove that the professional owed him a duty, and that the professional failed to live up to that duty, thus causing damages to the plaintiff. *Merzlak v. Purcell*, 252 Mont. 527, 529, 830 P.2d 1278, 1279 (1992); *accord* Opinion, ¶ 22. Here, Glacier alleged in its complaint:

> **duty:** Eide "had a duty to perform its professional obligations with the degree of learning, skill and judgment ordinarily possessed by members of the accounting profession and to perform any service undertaken in the manner a reasonably careful public accountant would do under the same or similar circumstances."

> **breach:** Eide "failed to satisfy the standard of care imposed on public accounting firms" and therefore "breached the applicable standard of care and such breach constitutes negligence."

> **causation and damages:** "As a result of [Eide's] breach of the standard of care owed by public accountants, [Western Security and Glacier] have been damaged . . . ."

¶74 In its motion for partial summary judgment, Glacier asked the District Court to rule on what legal standard would be applied in determining the existence of a *duty* in Glacier's *professional negligence* claim against Eide. Glacier began with the proposition that "[c]ertified public accountants are professionals and are liable for their professional negligence." Glacier went on to argue (on the issue of duty) that "[t]o the extent Eide Bailly now claims the [near-privity] test governs *professional negligence* claims against an accountant in Montana, the defense must be rejected" (emphasis added). Glacier instead

28

argued in favor of the "ordinary negligence" or "reasonably foreseeable plaintiff" test. In this regard, Glacier specifically eschewed the "intended or actually foreseen" standard of § 552, quoting the following remarks by Justice Trieweiler in *Jim's Excavating Service v. HKM Assocs.*, 265 Mont. 494, 878 P.2d 248 (1994):

> I would not limit an engineer's duty to exercise reasonable care to that class of people set forth in § 552. Section 27-1-701, MCA, provides that "everyone is responsible not only for the results of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill . . . ." I see no reason to treat engineers differently than anyone else, and therefore, would apply ordinary negligence rules to determine the scope of liability of the defendant in this case.

*Id.* at 517, 878 P.2d at 261 (Trieweiler, J., specially concurring). And in its reply brief, as the Court is forced to concede (Opinion, ¶ 29), Glacier offered § 552 only as an "alternative" to its preferred approach of applying ordinary negligence principles to the issue of duty. For these reasons, the Court's remaking of Glacier's professional negligence claim into a § 552 claim is especially egregious, given that Glacier actually eschews the Restatement's approach.

¶75    Likewise on appeal, the parties discuss § 552 not as a free-standing cause of action, but as one of the several standards which have been discussed in this Court's cases for deciding whether a duty exists in an action for professional negligence. (The other standards, discussed below, are the near-privity standard, the Prosser standard, and ordinary negligence rules.) Significantly, Glacier again does not argue in favor of adopting the restrictive "intended or actually foreseen" standard of § 552, but instead argues in favor of the broader "reasonably foreseeable plaintiff" standard or, at a minimum, the "knew or

29

should have foreseen" standard we applied in *Jim's Excavating*. Indeed, contrary to the Court's untenable remaking of Glacier's claim and legal theories, Glacier summarizes its argument as follows:

> The [District Court] erred in rejecting the "reasonable foreseeability" standard for the imposition of a duty on Eide regarding users of its IMC audit reports. This Court's decisions have either adopted that standard for *professional negligence* cases, or signaled it would be adopted in the proper case. [Emphasis added.] The court erred in holding that public policy does not support imposition of that standard. In fact, Montana statute imposes public duties on CPA auditors as to all reasonably foreseeable users of its audit reports.
> Although this Court need not reach this issue if it agrees with Glacier on issue one, the court also erred in holding Eide was entitled to summary judgment on the duty issue under the "actually foreseen" [i.e., § 552] and "near privity" standards.

Glacier then goes on to argue that it is "entitled to have a jury decide whether Eide's professionals were negligent, *i.e.*, whether they 'fail[ed] to use reasonable care.' " Glacier emphasizes that "reasonably foreseeable" is "the proper duty standard, and the [District Court] erred in refusing to apply it when ruling on summary judgment." As noted, Glacier offers § 552 only as an alternative standard for determining the existence of a duty; and even then, Glacier asks this Court to apply the modified "knew *or should have foreseen*" version of § 552 that we adopted in *Jim's Excavating*. Analogously, Eide argues in favor of the "near privity" standard, but then addresses § 552 only "to the extent that standard applies instead of the [near-privity] standard" for determining duty under what Eide refers to as Glacier's "accounting negligence" claim.

30

¶76 In sum, Glacier and Eide have always analyzed the question of duty with the understanding that Glacier is pursuing a professional negligence claim. And so did the District Court. The court specifically stated in its order that Glacier sued Eide "alleging a single count of professional malpractice," and the court then went on to address "the test in Montana for accountant liability to third parties" in professional negligence cases, ultimately adopting the near-privity standard.

¶77 Accordingly, it appears that this Court, once again, is the only participant in this case that does not recognize what the litigants and the trial court have known all along: that Glacier raised a professional negligence claim, not a negligent misrepresentation claim. *Cf. Jones v. Mont. Univ. Sys.*, 2007 MT 82, ¶¶ 60-76, 337 Mont. 1, 155 P.3d 1247 (Nelson, J., dissenting) (discussing the Court's remaking of Bob Kelleher's and Stan Jones' First Amendment claims in that case, despite the fact that "at every stage of the proceedings leading up to this appeal, the parties and the District Court all recognized that Kelleher and Jones were pursuing, among other things, a free speech claim under the First Amendment" (emphasis omitted)). Evidently unwilling to address the District Court's patently erroneous ruling on the issue of duty in a third-party professional negligence action against an accounting firm, the Court distorts Glacier's pleadings—proclaiming them to mean what the Court chooses them to mean, not what they actually say, *cf. Mont. Sports Shooting Assn. v. State*, 2008 MT 190, ¶ 38, 344 Mont. 1, 185 P.3d 1003 (Nelson, J., dissenting)—and then dismisses its own false construct. "It is inappropriate, however, for this Court to remake this

case, in ways that are contrary to the record before us, so as to facilitate expedient disposal of a case that presents difficult issues . . . ." *Jones*, ¶ 67 (Nelson, J., dissenting).

¶78   As support for its remaking of Glacier's claim, the Court observes that "Glacier does not assert a professional relationship." Opinion, ¶ 25. This is simply untrue. Glacier does assert a professional relationship: a *third-party* "professional relationship" between Glacier and Eide, under which Eide owed a duty of care to Glacier in the preparation of the IMC audit reports. However, to the extent the Court is suggesting that Glacier needed to assert a *first-party* "professional relationship" in order to maintain a professional negligence action, we have already rejected this restrictive, actual-privity approach. *See Watkins Trust v. Lacosta*, 2004 MT 144, ¶¶ 21-22, 321 Mont. 432, 92 P.3d 620; *Redies v. ALPS*, 2007 MT 9, ¶ 50, 335 Mont. 233, 150 P.3d 930. Indeed, such a requirement would be an indefensible reversal of the progression in our caselaw over the last three decades and take us back to the dark ages of privity.

¶79   Also as support for its approach, the Court points out that Glacier's complaint included allegations that Eide supplied false information in the audit reports of IMC. Opinion, ¶ 26. This is true, but these allegations were included to establish the element of breach (i.e., how Eide had breached the standard of care) in Glacier's professional negligence claim. Likewise, the Court points out that Glacier alleged justifiable reliance on the audit reports, Opinion, ¶ 26, but these allegations were included to establish the element of causation (i.e., how Eide's breach of duty had caused Glacier's damages) in Glacier's professional negligence claim. Glacier was not attempting to frame a negligent

32

misrepresentation claim, and the references to Eide's supplying of false information and Glacier's reliance on the audit reports do not give this Court license to morph Glacier's claim into something Glacier never intended—especially since Glacier had no notice that this Court would take Glacier's pleadings and affidavits, which were prepared and filed in support of a well-established four-element cause of action, and evaluate their sufficiency within the context of a newly articulated five-element cause of action.[1] This sort of bait-and-switch tactic by the Court is unfair in the extreme.

¶80 Finally, the Court observes that we have "treated professional negligence claims according to § 552 standards when the third party essentially alleges reliance on misrepresentations of information." Opinion, ¶ 27. Yet, that is not what the Court is doing here. It is not "treating" Glacier's "professional negligence" claim according to § 552 standards. Indeed, the Court asserts unequivocally that Glacier has not presented a "professional negligence" claim. Opinion, ¶¶ 26, 30. Rather, what the Court is doing here is "remaking" Glacier's "professional negligence" claim into a "§ 552 claim." It is axiomatic that "treating" a claim according to certain standards is not the same as "remaking" that claim into an entirely different cause of action. My disagreement with the Court's Opinion would be narrower if it were simply a question of which standard should be applied to

---

[1] The Court cites *Batten v. Watts Cycle & Marine, Inc.*, 240 Mont. 113, 117, 783 P.2d 378, 381 (1989), and *Weigand v. Mont. Land & Real Estate Inv.*, 223 Mont. 137, 139, 724 P.2d 194, 196 (1986), as authority for a negligent misrepresentation claim. *See* Opinion, ¶ 66. Yet, neither of these cases articulates the five-element "§ 552 claim" created by the Court today.

33

Glacier's "professional negligence" claim. As it is, however, my disagreement also includes the Court's sua sponte transformation of that claim.

¶81 It is unfair to remake a plaintiff's cause of action into something it never was intended to be and then to deny the plaintiff relief for failing to adequately support this remade cause. Indeed, if the plaintiff itself had changed the theory of its claim on appeal from that advanced in the district court, this Court would refuse to consider the changed theory. In *Stanton v. Wells Fargo Bank Mont., N.A.*, 2007 MT 22, 335 Mont. 384, 152 P.3d 115, for example, we observed:

> Trail's End argued in the District Court that Stanton had committed constructive fraud . . . . Trail's End argues on appeal, however, that Stanton committed actual fraud. The general rule in Montana is that we will not address either an issue raised for the first time on appeal or a party's change in legal theory. We decline to address this issue.

*Stanton*, ¶ 35 (citation omitted).[2] If on appeal a party may not change its legal theory from constructive fraud to actual fraud, certainly *this Court* may not sua sponte change a party's legal theory from professional negligence to negligent misrepresentation.

¶82 To summarize, then, "[a] professional negligence claim asserts that the accountant negligently performed its professional services." Opinion, ¶ 22. Here, Glacier asserts that Eide "had a duty to perform its professional obligations with the degree of learning, skill and judgment ordinarily possessed by members of the accounting profession," that Eide "failed to satisfy the standard of care imposed on public accounting firms," that Eide thus "breached

---

[2] This rule is so often invoked by every member of this Court that it would be silly to provide pages of string-cites for the principle—which, in this case, we ignore.

34

the applicable standard of care," and that "such breach constitutes negligence." This is a professional negligence claim under the Court's own definition, and the Court's refusal to recognize it as such undermines Glacier's pleadings and the manner in which Glacier has developed its case against Eide. The fact is that Glacier is pursuing a professional negligence claim against an accounting firm, and the question presented—which the Court does not answer (Opinion, ¶ 30)—is what standard should be applied for determining whether a duty exists between the accountant and the plaintiff.

¶83 Turning to this question, we summarized the rules with respect to duty in *Fisher v. Swift Transp. Co.*, 2008 MT 105, 342 Mont. 335, 181 P.3d 601: "[T]he existence of a duty turns primarily on foreseeability. . . . We ask whether the defendant could have reasonably foreseen that his or her conduct could have resulted in an injury to the plaintiff. A plaintiff is a foreseeable plaintiff if she or he is within the foreseeable zone of risk created by the defendant's negligent act." *Fisher*, ¶ 21 (internal quotation marks and citations omitted). While this "foreseeable plaintiff" standard would seem applicable as a general rule, *see* § 27-1-701, MCA, our caselaw contains other standards for determining the scope of a professional's duty to a third party (nonclient) in a professional negligence action. These other standards reflect the somewhat cautious progression nationwide away from the "privity" approach toward the "foreseeable plaintiff" approach. I review the standards below but first note the "privity of contract" defense.

¶84 "Privity of contract" refers to "[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so." *Black's Law*

35

*Dictionary* 1320 (Bryan A. Garner ed., 9th ed., Thomson Reuters 2009). We have held that privity is not required to maintain an action grounded in negligence:

> This Court was a pioneer in abolishing privity as a requirement for recovery in a personal injury or wrongful death case. *Brandenburger v. Toyota* (1973), 162 Mont. 506, 513 P.2d 268. We have not felt permanently bound to archaic legal concepts no matter how deeply rooted they may be. We view privity to be a concept having proper application in the area of contract law. There seems to be no sound public policy argument for extending its application to tort.

*Hawthorne v. Kober Const. Co.*, 196 Mont. 519, 523, 640 P.2d 467, 469 (1982).

¶85     Consistent with *Hawthorne*, we have rejected the privity of contract defense in a variety of contexts. *See e.g. Tynes v. Bankers Life Co.*, 224 Mont. 350, 359-60, 730 P.2d 1115, 1121 (1986) (insurer liable in tort to insured's father, notwithstanding the absence of privity); *Thayer v. Hicks*, 243 Mont. 138, 149, 793 P.2d 784, 791 (1990) (accountant liable to third parties who he knows intend to rely upon his work product); *Jim's Excavating Service v. HKM Assocs.*, 265 Mont. 494, 502-06, 878 P.2d 248, 252-55 (1994) (project engineer or architect liable to third parties who foreseeably may rely on the information supplied by the engineer or architect); *Turner v. Kerin & Assocs.*, 283 Mont. 117, 125-26, 938 P.2d 1368, 1373-74 (1997) (engineering firm liable to any party who holds or succeeds to a security interest in the property serviced by the firm); *Watkins Trust v. Lacosta*, 2004 MT 144, ¶¶ 21-22, 321 Mont. 432, 92 P.3d 620 (drafting attorney owes duty to nonclient beneficiaries named in the drafted instrument).

¶86     Furthermore, this Court more recently explained that

36

*Hawthorne*, *Tynes*, *Thayer*, *Jim's Excavating*, *Turner*, and *Rhode* [*v. Adams*, 1998 MT 73, 288 Mont. 278, 957 P.2d 1124,] reflected the demise of the "privity of contract" requirement historically imposed upon a plaintiff seeking to hold a defendant liable for professional malpractice. Indeed, we indicated in *Jim's Excavating* that this requirement had been "abolish[ed]." *See Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 253 (referring to "the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort"). However, none of these cases abolished the requirement that a plaintiff in a professional malpractice action first prove that the defendant owed her a duty of care . . . . In other words, the mere absence of a privity requirement does not render a professional liable for the negligent performance of a contract to any and all third parties. To the contrary, in recognizing tort liability in the absence of privity, we have concomitantly limited the class of plaintiffs to identifiable third parties (typically, those who are known or are reasonably foreseeable by the professional, *see Thayer*, 243 Mont. at 149, 793 P.2d at 791; *Jim's Excavating*, 265 Mont. at 506, 878 P.2d at 255).

*Redies v. ALPS*, 2007 MT 9, ¶ 50, 335 Mont. 233, 150 P.3d 930.

¶87 The question, then, "is not whether [the professional] owes a duty of care to third parties but, rather, just how far the duty extends." *Thayer*, 243 Mont. at 144, 793 P.2d at 788. In this regard, we have recognized the following possible approaches.

¶88 **1. Prosser's Standard.** In Prosser, *The Law of Torts* § 93, at 622, 623 (4th ed., West 1971), Professor Prosser states:

[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor *when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person*. [Emphasis added.]

.   .   .

37

> . . . [T]here are situations in which the making of the contract creates a relation between the defendant and the promisee, which is sufficient to impose a tort duty of reasonable care. By the same token, there are situations in which the making of a contract with A may create a relation between the defendant and B, which will create a similar duty toward B, and may result in liability for failure to act.

¶89 We adopted this standard in *Hawthorne*, 196 Mont. at 523-24, 640 P.2d at 470, and held that a subcontractor may assert negligence claims against the general contractor's steel supplier. We observed that "by entering into a contract with [the general contractor], [the steel supplier] has placed itself in such a relation toward [the subcontractor], that the law will impose upon [the steel supplier] an obligation, sounding in tort, to act in such a way that [the subcontractor] will not be injured." *Id.* at 524, 640 P.2d at 470. We have since applied Prosser's standard in subsequent cases. *See e.g. Tynes*, 224 Mont. at 359-60, 730 P.2d at 1121; *Jim's Excavating*, 265 Mont. at 502, 506, 878 P.2d at 253, 255; *Turner*, 283 Mont. at 125-26, 938 P.2d at 1373-74.

¶90 **2. The *Thayer* Standards.** Meanwhile, in *Thayer*, we addressed the issue of "[t]o what extent does an accountant owe a duty of care to third parties with whom he is not in privity?" 243 Mont. at 144, 793 P.2d at 788. At the outset, we observed:

> While some jurisdictions adhere to the rule that an accountant may not be held liable in negligence to parties with whom he is not in privity of contract, the modern trend allows recovery to non-clients in certain instances. *The question most courts grapple with today is not whether an accountant owes a duty of care to third parties but, rather, just how far the duty extends.* In dealing with this issue, courts have employed three different approaches. The first approach limits the duty of care to those third parties who are *actually known* to the accountant, the second limits the duty to those who are *actually foreseen* and the third expands the duty to all those who are *reasonably foreseeable*.

38

*Id.* (emphases added, citations omitted). We then explained these three approaches.

¶91    **2a. Near Privity ("actually known").** In *Ultramares Corp. v. Touche*, 174 N.E. 441 (N.Y. 1931), the court limited an accountant's duty of care to those in privity of contract with the accountant or those whose bond was so close as to approach that of privity. In *Credit Alliance Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 115 (N.Y. 1985), the court held that "a relationship 'so close as to approach that of privity' [*Ultramares*] remains valid as the predicate for imposing liability upon accountants to noncontractual parties for the negligent preparation of financial reports." The *Credit Alliance* court delineated three factors to guide courts in determining whether this "near privity" bond exists: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance. *Id.* at 118; *see also Thayer*, 243 Mont. at 144-45, 793 P.2d at 788.

¶92    **2b. Restatement (Second) of Torts § 552 (1977) ("actually foreseen").** The Restatement expands the "known third party" rule of *Credit Alliance*. It provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Unlike the "near privity" approach, § 552 does not require the accountant to *actually know* the identity of the specific third party and the particular transaction before liability will lie. Section 552 requires only that the accountant *intend* or *foresee* that members of a limited class will rely on his representations in determining whether to enter into a transaction with the audited entity, and the transaction the parties enter into must be of a type *actually foreseen* by the accountant. *See Thayer*, 243 Mont. at 146, 793 P.2d at 789.

¶93 **2c. Ordinary Negligence Rules ("reasonably foreseeable").** Some jurisdictions have extended an accountant's duty to third parties beyond the "actually foreseen" class of § 552. These jurisdictions apply ordinary negligence rules when dealing with the question of the scope of liability, holding that an accountant owes a duty to all who might reasonably and foreseeably obtain and rely upon the accountant's work product. *See Thayer*, 243 Mont. at 146, 793 P.2d at 789 (citing cases); *see also Jim's Excavating*, 265 Mont. at 516-17, 878 P.2d at 261 (Trieweiler, J., specially concurring).

¶94 **2d. *Thayer*'s Ultimate Approach.** After discussing these three approaches, we observed that "[i]n the present case, as in *Credit Alliance*, the accountant actually knew that a specific third party would obtain and rely upon the audit in question." *Thayer*, 243 Mont. at 147, 793 P.2d at 790. Thus, because the facts met the strictest of the three formulations of an accountant's duty of care to nonclients (i.e., the "near privity" standard), we saw "no need to adopt a more liberal standard at this time." *Id.* at 146, 793 P.2d at 789. We instead applied "a modified version of the *Credit Alliance* rule." *Id.* Specifically, we held that an accountant may owe a duty of care to third parties "only if the accountant actually knows that a specific third party intends to rely upon his work product and only if the reliance is in connection with a particular transaction or transactions of which the accountant is aware when he prepares the work product." *Id.* at 149, 793 P.2d at 791. Accordingly, we adopted in *Thayer* the strictest approach that was necessary to resolve the case, but we did not preclude the possibility that a broader standard could apply under a different set of facts.

¶95 **3. The Modified § 552 Standard.** In *Jim's Excavating*, the plaintiff (JES), a construction contractor, filed suit against the defendant (HKM), an engineering firm, over the negligent preparation of plans and specifications relating to a water transmission pipeline. In defense, HKM first argued that JES's negligence claim failed because HKM had been retained by a different entity and, thus, there was no contractual privity between JES and HKM. We rejected this argument outright, noting that the requirement of privity to maintain an action in tort had been "abolish[ed]." *Jim's Excavating*, 265 Mont. at 502, 878 P.2d at 253. HKM then relied on *Thayer* (as Eide does here) for the proposition that there

41

has to be some sort of connection or "quasi-privity" before tort liability can be imposed on a professional. We acknowledged that the facts before us did not meet the test adopted in *Thayer* because HKM's negligent act occurred before HKM "actually knew" that JES, specifically, would be relying on the negligently prepared plans and specifications. But we concluded that "HKM should not escape from liability simply because it did not actually know JES would receive the bid, when it knew that some contractor would be relying on its plans and specifications." *Id.* at 504, 878 P.2d at 254.

¶96 To that end, we applied *Restatement (Second) of Torts* § 552—which this Court had adopted 11 years earlier in *State Bank of Townsend v. Maryann's, Inc.*, 204 Mont. 21, 33-35, 664 P.2d 295, 301-02 (1983)—though we modified the § 552 test in a significant way. As noted, § 552 limits liability to only those persons who the accountant *intended* or *actually foresaw* would rely on his representations in a *foreseen* transaction. We held in *Jim's Excavating*, however, that a third-party contractor may recover from a project engineer or architect when the design professional "*knew* or *should have foreseen* that the particular plaintiff or an identifiable class of plaintiffs were at risk in relying on the information supplied." 265 Mont. at 506, 878 P.2d at 255 (emphases added). The critical question is whether the plaintiff is someone who the professional knew or should have foreseen was at risk in relying on the information or services provided.

¶97 **4. Prosser's Standard and the Modified § 552 Standard Combined.** Three years later, in *Turner*, the district court held that the plaintiff (Turner) could not state a claim under the modified § 552 standard because he could not prove that the engineering firm (Kerin)

42

"should have foreseen that the particular plaintiff, or an identifiable class of plaintiffs were at risk in relying on the information supplied." *See Turner*, 283 Mont. at 125, 938 P.2d at 1374. We disagreed. After quoting both Prosser's Standard and our holding in *Jim's Excavating*, we reasoned:

> In the present case, by contracting with the owners to perform engineering work on the property, *Kerin placed itself in a relation toward any party who held a security interest in the property that the law imposed upon him an obligation, sounding in tort and not in contract, to act in such a way that the security interest would not be injured* [Prosser's Standard]. Kerin *knew or should have foreseen* that if, contrary to his representations, he relaid with pipe not meeting requisite pipe standards, he would diminish the value of the property and thereby impair the value of the property as security [the modified § 552 standard]. It was *foreseeable* that failure to lay the proper pipe would damage *an identifiable class of plaintiffs*; i.e. those who held an interest in the property, both mortgagors and mortgagees [the modified § 552 standard]. The fact that Kerin could not specifically foresee Turner's entry into the picture does not change the fact that Turner is a member of an identifiable class of plaintiffs, that is, he is a mortgagee by virtue of having purchased mortgages which were in existence at the time of Kerin's work and which, allegedly, have not been satisfied.

*Id.* at 126, 938 P.2d at 1374 (emphases added).

¶98 **Summary.** The question, again, "is not whether [the professional] owes a duty of care to third parties but, rather, just how far the duty extends." *Thayer*, 243 Mont. at 144, 793 P.2d at 788. As Glacier points out, and as our post-*Thayer* decisions confirm, we have already expanded this duty beyond the "near privity" standard we applied in *Thayer*. Since then, we have applied a modified, broader version of § 552 and have also applied the Prosser Standard. The progression in our caselaw, with regard to a professional's duty of care to noncontractual third parties, has clearly been toward extending that duty to include those

43

who the professional *knew or should have foreseen* were at risk in relying on the information or services provided. All that is left to do is to make that holding explicit with respect to accountants—something we did not do in *Thayer* only because we did not have to on the facts presented there.

¶99 Returning to Glacier's claim, it is important to reiterate that Glacier is *not* advocating for the application of § 552, and Glacier is certainly not pursuing a so-called "§ 552 claim." Rather, Glacier is pursuing a professional negligence claim and is arguing for the "reasonably foreseeable plaintiff" standard or, at a minimum, the "knew or should have foreseen" version of § 552 that we adopted in *Jim's Excavating.* In my view, Glacier's argument is well-taken because the unmodified version of § 552 (the "intended or actually foreseen" test) is an unduly restrictive standard to the extent it precludes Glacier's claim against Eide in this case. I would apply the standard that we applied to engineers and architects and hold that an accountant owes a duty of care to a person or entity who the accountant "knew or should have foreseen" was at risk in relying on the information supplied. *Jim's Excavating*, 265 Mont. at 506, 878 P.2d at 255.

¶100 Here, Eide held itself out as a Top 25 accounting firm in the nation, in business since 1917. It provided audits of IMC's financial statements and issued "unqualified opinions" regarding those financial statements. Eide purportedly did so in accordance with generally accepted accounting principles—although Glacier's expert (Larry Barton), a certified public accountant, reviewed the audit work papers produced by Eide from 2001 through 2006 and concluded (as stated in his affidavit) that Eide had breached the professional standards

44

applicable to CPAs. Eide knew that these audits were required by FCB for purposes of

determining whether and how much credit should be extended to IMC. Eide knew or should

have foreseen that a prospective purchaser of FCB or FCB's holding company (CDC) would

review and rely on the IMC audits as part of its due diligence. In this regard, Barton stated

that a Top 25 CPA firm like Eide "would have information and reason to know" that the

financial institutions with which IMC did business, including their holding companies, are

often bought and sold. Moreover, Eide "would have reason to know or expect," and in fact

"knew or should have known," that a company (such as Glacier), which was considering

acquiring those financial institutions with which IMC did business, "would likely review and

rely upon documents maintained in the files of those financial institutions, particularly the

audited financial statements of the companies, like IMC, with which such financial

institutions have on-going, multi-million dollar lending relationships." Indeed, Eide actually

did know when it issued the June 2006 report that Glacier had agreed to acquire CDC and,

thus, would be relying on the IMC audits—a fact the Court chooses to ignore.[3] As we stated

in *Jim's Excavating*, a third party may recover in tort from a project engineer or architect

who "knew or should have foreseen that the particular plaintiff or an identifiable class of

plaintiffs were at risk in relying on the information supplied." 265 Mont. at 506, 878 P.2d at

255. While Eide seeks a special exemption from this standard, Eide has provided no

_____

[3] John Jacobsen (an Eide CPA) admits in his affidavit that Glacier's purchase was announced in April 2006. But he then attempts to hide behind the fact that "[a]t that time, Eide Bailly was merely the auditor of IMC"—a defense premised entirely on privity of

45

compelling reason why the duty applicable to other professionals should not also apply to accountants.

¶101 The Court engages in some shoveling of smoke and a little sleight of hand, asserting that *Jim's Excavating* "adopted and applied the principles of [§ 552]" and that the Court's analysis herein "follows the analysis adopted in *Jim's Excavating*." Opinion, ¶ 45. I authored the *Jim's Excavating* opinion, however, and can state with certainty that the Court's analysis in the present case is not at all faithful to the analysis in *Jim's Excavating*. For one thing, we did not remake JES's four-element professional negligence claim into a five-element negligent misrepresentation claim, as the Court does to Glacier here. *See Jim's Excavating*, 265 Mont. at 500-01, 878 P.2d at 251-52 (describing JES's professional negligence claim). Furthermore, contrary to the Court's revisionist history, we did not apply § 552's "intended or actually foreseen" standard which the Court imposes on Glacier today. Rather, we held that a professional's duty of care extends to those who the professional "knew or should have foreseen" were at risk in relying on the information supplied. *Id.* at 506, 878 P.2d at 255.[4] Obviously, a duty of care limited to what the professional "intended" or "actually foresaw" is much narrower than a duty of care that includes what the professional "knew" or "should have foreseen."

_____

contract which, as explained above, this Court has consistently rejected since the early 1970s.

[4] Specifically, we stated: "Thus, we hold that a third party contractor may successfully recover for purely economic loss against a project engineer or architect when the design professional knew or should have foreseen that the particular plaintiff or an identifiable class of plaintiffs were at risk in relying on the information supplied." *Id.*

46

¶102 Nevertheless, in quoting from this part of the *Jim's Excavating* opinion, the Court emphasizes the words "the particular plaintiff or an identifiable class of plaintiffs" and then asserts that it has "turned to principles set forth in § 552" in order to define this class of plaintiffs. Opinion, ¶ 45. What the Court fails to acknowledge, however, is that we already defined the class in *Jim's Excavating*. As stated, it consists of those persons who the professional knew or should have foreseen were at risk in relying on the information supplied. 265 Mont. at 506, 878 P.2d at 255. Of course, what the professional knew or should have foreseen will depend on the surrounding circumstances. But in the present case, Glacier has come forward with evidence, sufficient in my view to withstand summary judgment against it, that Eide *should have foreseen* that a prospective purchaser of FCB would review and rely on the pre-2006 IMC audits as part of its due diligence, and that Eide *did know* that Glacier would review and rely on the 2006 IMC audit.

¶103 The Court resorts to subtle scare tactics—employing terms such as "unforeseen liability exposure" and "an infinitely large class" of plaintiffs—in rejecting Barton's affidavit. Opinion, ¶¶ 34, 38. I am not persuaded, however, that the "knew or should have foreseen" standard would lead to the "unforeseen" and "infinitely large" liability exposure feared by the Court. We have applied this standard to engineers and architects, and those industries have in no way collapsed as a result.

¶104 I also am not persuaded by the Court's assertion that "Glacier's reliance on the audit reports in its merger transaction constitutes a use different than the use for which Eide had supplied the information." Opinion, ¶ 43. This is absurd. The obvious "use" of the audit

reports by all involved was to obtain an accurate assessment of IMC's ability to pay back its loans from FCB. Certainly, a prospective buyer of FCB would review the reports for that very purpose.

¶105 Finally, it is contrary to public policy to hold that the purchaser of FCB cannot maintain an action in tort against Eide for the negligent preparation of the IMC audit reports. As Glacier points out, an independent auditor serves not only the client, but also the foreseeable users of its work product. *Cf. United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18, 104 S. Ct. 1495, 1503 (1984). Indeed, the practice of public accounting is defined as "performing . . . for a client . . . one or more types of services involving the use of accounting or auditing skills," including "the issuance of reports or financial statements *on which the public may rely*." Section 37-50-101(10)(a), MCA (emphasis added). Moreover, an accountant "who, because of *negligence*, . . . issues or permits the issuance of any false statement of the financial transactions, standing, or condition of any firm or individual business undertaking is guilty of a misdemeanor . . . ." Section 37-50-401, MCA (emphasis added). Montana's public policy is reflected in these statutory provisions, *see First Bank (N.A.)-Billings v. Transamerica Ins. Co.*, 209 Mont. 93, 96, 679 P.2d 1217, 1219 (1984), and these policy considerations call for application of the "knew or should have foreseen" standard. An accountant who is negligent in the preparation of reports on the financial condition of a firm should not be permitted to hide behind the defense that "I did not intend, nor did I foresee, that a future prospective buyer of that firm would look at and rely on the reports I negligently prepared concerning the firm's financial standing." Such an assertion—

48

which Eide shamelessly employs in the present case—is preposterous and defeats the intent of Montana's statutes governing accountants. Eide failed to discover and disclose that Hakala was cooking IMC's books to the tune of $7.2 million, but Eide nevertheless issued "unqualified opinions" regarding IMC's financial statements. Eide's defense to Glacier's legitimate reliance on the IMC audits smacks of Arthur Andersen's when Enron folded.

¶106 In short, § 552's "intended or actually foreseen" standard limits an accountant's liability too narrowly. The better standard, which is consistent with the public policy of this state, is the one that we have already adopted and applied to other professionals: the "knew or should have foreseen" standard. I would hold that the District Court erred in applying the outmoded "near privity" standard and that Glacier is entitled to a trial on its professional negligence claim under the "knew or should have foreseen" standard.

**Issue 3**

¶107 Turning now to Issue 3, I agree with the Court that the District Court erred in dismissing Western's fraudulent misrepresentation claim. Opinion, ¶¶ 56-62. I disagree, however, with the Court's conflation of Western's professional negligence claim into its negligent misrepresentation claim. Opinion, ¶ 64. As the Court acknowledges at the outset, Western's amended complaint contains both a "professional negligence" claim and a "negligent misrepresentation" claim, which are set out as two separate counts. *See* Opinion, ¶ 56. It is unfair and unacceptable for the Court to conflate these two counts into one "§ 552 claim."

¶108 The case proceeded to trial on Western's professional negligence claim, and the court erroneously instructed the jury based on the obsolete "near privity" standard applied in *Thayer*. Western presents a persuasive argument that this error was not harmless. Thus, I would reverse and remand for a new trial on this claim.

¶109 In addition, the Court explains in ¶¶ 21-24 that a negligent misrepresentation claim is distinct from a professional negligence claim. It follows, therefore, that the District Court erred in dismissing Western's negligent misrepresentation claim on the ground that it simply "duplicated" Western's professional negligence claim. *See* Opinion, ¶ 63. I therefore agree with the Court's decision to remand for a new trial on the negligent misrepresentation claim. Opinion, ¶ 67.

**Conclusion**

¶110 Rather than clarify the scope of a professional's liability to noncontractual third parties, the Court only muddles our jurisprudence in this area even further. With today's decision, there are at least eight standards recognized in our caselaw:

1. the "near privity" test (*Thayer*, citing *Credit Alliance*)
2. the "modified version of the *Credit Alliance* rule" test (*Thayer*)
3. the § 552 "intended or actually foreseen" test (*Thayer* and today's decision)
4. the modified § 552 "knew or should have foreseen" test (*Jim's Excavating*)
5. Prosser's "expected to affect the interests of another person" test (*Hawthorne* and *Tynes*; also discussed in *Jim's Excavating*)
6. the combined Prosser and modified § 552 test (*Turner*)
7. the *Trask* multi-factor balancing test (*Rhode* and *Redies*[5])

---

[5] *See Rhode v. Adams*, 1998 MT 73, ¶ 17, 288 Mont. 278, 957 P.2d 1124; *Redies v. ALPS*, 2007 MT 9, ¶¶ 44, 50, 335 Mont. 233, 150 P.3d 930. The *Trask* test addresses whether an attorney owes a duty of care to nonclients.

50

8. the "reasonably foreseeable plaintiff" test (§ 27-1-701, MCA, and ordinary negligence rules)

How a litigant is to know which of these standards applies in a given case we are not told. Nor are we told why accountants presently enjoy greater protection for their negligent acts and omissions which injure third parties than do engineers (*Jim's Excavating* and *Turner*), insurers (*Tynes*), and attorneys (*Watkins Trust* and *Redies*). What is clear, however, is that this Court has no qualms about remaking a plaintiff's cause of action into whatever claim this Court wants it to be and then applying whichever standard the Court believes suits the occasion.

¶111 I therefore dissent from the Court's decision as to Issue 1. Glacier alleged a professional negligence claim, not a negligent misrepresentation claim. In determining the issue of duty, I would apply the "knew or should have foreseen" standard that we apply to engineers and architects. Doing so, I conclude that prospective purchasers of FCB (such as Glacier) are an identifiable class of plaintiffs which Eide knew or should have foreseen were at risk in relying on Eide's "unqualified opinions" regarding IMC's financial statements. Accordingly, I would hold that the District Court erred in granting summary judgment to Eide and that Glacier should be allowed to proceed to trial on its professional negligence claim.

¶112 As to Issue 2, I concur in the Court's resolution of this issue.

¶113 Lastly, as to Issue 3, I concur in the Court's decision to reverse the District Court's dismissal of Western's fraudulent misrepresentation claim. I also concur in the Court's

51

decision to remand for a trial on Western's negligent misrepresentation claim. But I dissent from the Court's conflation of Western's professional negligence and negligent misrepresentation claims. Western alleged these as separate counts; and because the District Court rendered erroneous jury instructions on the professional negligence claim, I would reverse and remand for a retrial on this claim.

¶114 In closing, plaintiffs should be aware that, henceforth, when they assert a professional negligence claim in district court, on appeal this Court may sua sponte morph that claim into a negligent misrepresentation claim. Accordingly, plaintiffs should plead and argue their cases with enough flexibility to cover whatever action this Court happens to land on. Glacier's complaint, a copy of which is included below, shows the sort of pleading that may result in the remaking of a professional negligence claim into a negligent misrepresentation claim by this Court.

¶115 I concur and dissent.

/S/ JAMES C. NELSON

MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

| | |
|---|---|
| WESTERN SECURITY BANK and GLACIER BANCORP, INC., ) ) ) Plaintiffs, ) ) v. ) ) EIDE BAILLY LLP, ) ) Defendant. ) | Cause No. **DV 07 – 1463** Judge: *GREGORY R. TODD* **COMPLAINT AND DEMAND FOR JURY TRIAL** 120/175048 |

IMAGED

Plaintiffs, Western Security Bank ("WSB") and Glacier Bancorp, Inc. ("GBCI"), by and through their counsel of record, Holland & Hart LLP, for their Complaint against Defendant alleges as follows:

**PARTIES**

1. Plaintiff WSB is a Montana corporation with its principal place of business in Billings, Montana. WSB is a Montana state-chartered bank with branch locations in Yellowstone County. WSB is a wholly-owned subsidiary of GBCI.



2. Plaintiff GBCI is a corporation organized under the laws of the State of Montana. GBCI is a bank holding company that owns bank subsidiaries in Montana, Idaho, Washington, Wyoming and Utah.

3. Defendant Eide Bailly LLP ("Eide Bailly") is a limited liability partnership with offices located throughout the western United States, including an office in Billings, Montana.

## GENERAL ALLEGATIONS

4. Intermountain Mortgage Co., Inc. ("IMC") is a Montana corporation with its principal place of business in Billings, Yellowstone County, Montana. Until approximately February 2007, IMC was mortgage banker.

5. Citizens Development Company ("CDC") was a corporation organized under the laws of Montana. CDC formerly was the parent holding company of five bank subsidiaries operating in Montana, including First Citizens Bank of Billings.

6. First Citizen's Bank of Billings ("FCB") was a corporation organized under the laws of the State of Montana. FCB was formerly a Montana state-chartered bank with branches in Billings and Laurel, Montana.

7. IMC was a major customer of FCB and maintained substantial deposits and loan balances throughout the period relevant to this action.

8. In approximately November 2005 CDC publicly announced that it was in the market to sell the stock of CDC. Shortly thereafter, GBCI began investigating a potential purchase of CDC.

9. In approximately April 2006, as part of its due diligence evaluation of the potential purchase of CDC, GBCI representatives reviewed financial information of CDC, including financial information concerning FCB and customers of FCB. In particular, GBCI

-2-

representatives reviewed the 2004 and 2005 fiscal year's financial statements of IMC which had been prepared and audited by Eide Bailly. The 2004 and 2005 audited financial statements were the most recent of several annual audits of IMC that Eide Bailly had performed as of the time of GBCI's evaluation of CDC and FCB.

10. Eide Bailly's fiscal year-end 2004 and 2005 audits of IMC represented, among other things:

    a.    IMC's cash and cash equivalents were $1.8 million in 2004, and $3.5 million in 2005.

    b.    IMC's receivables were $17.7 million in 2004 and $15 million in 2005.

    c.    The audits were unqualified.

11. GBCI and CDC eventually agreed to the terms of a merger, and the transaction closed on or about September 30, 2006 with GBCI acquiring all of the stock of CDC.

12. GBCI subsequently merged some of the CDC subsidiary banks into existing GBCI subsidiaries. FCB was merged into WSB effective January 29, 2007 making WSB the successor by merger to FCB. After January 29, 2007 FCB ceased to exist as a legal entity.

13. GBCI based the total purchase price for the acquisition of CDC on multiples of CDC's earnings and deposit base. IMC's deposits and loans with FCB constituted a substantial portion of CDC subsidiary bank deposits and a significant portion of CDC's interest income and net income. GBCI reasonably relied on the accuracy of those numbers in establishing the price for CDC and its decision to proceed with any acquisition of CDC.

14. Beginning in approximately 1997, FCB and IMC entered into a Warehouse Loan Agreement whereby FCB would loan money to IMC on a revolving basis to fund purchases of real estate-secured mortgage loans originated by IMC with homebuyers. In 2000, IMC and FCB entered into a new Loan Warehousing Agreement ("Warehouse Agreement"). Over the years the

-3-

55

maturity of the Warehouse Agreement was extended and the line of credit was increased so that by February 2007 the total revolving advances available to IMC under the line of credit had increased to $19.5 million.

15. A material term of the Warehouse Agreement provided that on an annual basis, IMC was obligated to provide audited financial statements to FCB. FCB required annual audited financial statements so that it could evaluate the financial condition and credit-worthiness of IMC and determine whether to renew the line of credit and increase or decrease the amount of the revolving loan as requested by IMC from time-to-time.

16. The Warehouse Agreement specifically required that the financial statements of IMC be prepared in accordance with generally accepted accounting principles and that IMC's financial statements be audited each year by a certified public accounting firm satisfactory to FCB.

17. To fulfill its obligation to provide audited financial statements to FCB, IMC retained Eide Bailly to conduct the annual audits. In addition to conducting the annual audits, Eide Bailly performed other accounting services for IMC including consulting and preparation of tax returns both for IMC and for some of IMC's major shareholders. Eide Bailly acted as the primary certified public accounting firm for IMC from at least 2000 through February 2007.

18. Eide Bailly holds itself out to the public to be qualified to audit the financial statements of mortgage bankers such as IMC.

19. Eide Bailly knew that pursuant to the terms of the Warehouse Agreement, IMC was obligated to provide to FCB audited financial statements of IMC.

20. Each year, once Eide Bailly's audit of IMC's financial statements were completed, a copy was provided to FCB. FCB reviewed the audited financial statements in

-4-

order to evaluate further extensions of credit to IMC. Eide Bailly performed audits of IMC from 2000 through 2006, and FCB received and relied upon each of them.

21. Based on its reliance on the financial condition of IMC as represented by IMC's audited financial statements, FCB increased IMC's line of credit from the original amount of $7.5 million in 2000 to $19.5 million in 2006.

22. On or about February 8, 2007, IMC delivered a letter to WSB informing it that Angela Hakala, the Chief Financial Officer of IMC, had used cash from the "Warehouse Account" for "other purposes many times in the past" over a four or five year period. The letter also disclosed that as a result of Ms. Hakala's actions IMC's accounts receivables, assets, income and profit were overstated on its prior financial statements.

23. None of Eide Bailly's audits of IMC ever uncovered the financial misdealings of Ms. Hakala.

24. The amounts reported in Eide Bailly's audited financial reports of IMC, including but not limited to the amounts listed for receivables and cash and cash equivalents in the 2004 and 2005 audited statements reviewed by GBCI, were materially overstated.

25. In conducting its audits of IMC, Eide Bailly failed to discover or disclose material misstatements in the financial statements of IMC.

26. In conducting its audits of IMC, Eide Bailly failed to discover or disclose that funds from the Warehouse Account had been used for purposes other than paying down the line of credit when IMC sold mortgages on the secondary market.

27. In conducting its audits of IMC, Eide Bailly represented that the financial statements of IMC were prepared in accordance with generally accepted accounting principles. They were not.

-5-

57

28. In reporting the results of its audits of IMC, Eide Bailly represented that the audits were performed in accordance with generally accepted auditing standards. They were not.

29. IMC has defaulted on its obligations under the Warehouse Agreement.

30. IMC is now insolvent and has ceased doing business as a going concern.

## PROFESSIONAL NEGLIGENCE

## COUNT I

31. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 30 above.

32. As a certified public accounting firm, Eide Bailly had a duty to perform its professional obligations with the degree of learning, skill and judgment ordinarily possessed by members of the accounting profession and to perform any service undertaken in the manner a reasonably careful public accountant would do under the same or similar circumstances.

33. Eide Bailly failed to satisfy the standard of care imposed on public accounting firms as a matter of law. Therefore, Eide Bailly breached the applicable standard of care and such breach constitutes negligence.

34. GBCI relied on the representations in the audit reports prepared by Eide Bailly for IMC's 2004 and 2005 financial statements when it evaluated the purchase of CDC.

35. Eide Bailly knew, or had reason to know that GBCI or other potential purchasers of CDC would rely on Eide Bailly's audits of FCB.

36. From year-to-year, FCB relied on Eide Bailly's annual audits of IMC in making its credit decisions concerning IMC.

-6-

37. Eide Bailly knew that audited financial statements were a requirement of the Warehouse Agreement between IMC and FCB. Eide Bailly knew or should have known that FCB would rely on the audited financial statements of IMC in making its credit decisions.

38. It was reasonably foreseeable that FCB would rely on Eide Bailly's audited financial statements of IMC in evaluating its credit decisions concerning IMC.

39. It was reasonably foreseeable that third parties such as GBCI would rely on Eide Bailly's audited financial statements of IMC in evaluating its potential purchase of CDC and in determining the purchase price.

40. As a result of Eide Bailly's breach of the standard of care owed by public accountants, WSB, as successor to FCB, and GBCI have been damaged in amounts to be proven at trial.

WHEREFORE, Plaintiffs pray as follows:

1. That Plaintiffs recover damages in an amount to be determined at trial; and

2. For such further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.